GEBSER ET AL. *v.* LAGO VISTA INDEPENDENT
SCHOOL DISTRICT

No. 96–1866.   Argued March 25, 1998—Decided June 22, 1998

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. STEVENS, J., filed a dissenting opinion, in which SOUTER, GINSBURG, and BREYER, JJ., joined, *post,* p. 293. GINSBURG, J., filed a dissenting opinion, in which SOUTER and BREYER, JJ., joined, *post,* p. 306.

*Terry L. Weldon* argued the cause for petitioners. With him on the briefs were *Cynthia L. Estlund* and *Samuel Issacharoff.*

*Beth S. Brinkmann* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were *Solicitor General Waxman, Acting Assistant Attorney General Lee, Deputy Solicitor General Wallace, Deputy Assistant Attorney General Pinzler, Dennis J. Dimsey,* and *Rebecca K. Troth.*

*Wallace B. Jefferson* argued the cause for respondent. With him on the brief were *Ellen B. Mitchell* and *N. Mark Ralls.**

JUSTICE O'CONNOR delivered the opinion of the Court.

The question in this case is when a school district may be held liable in damages in an implied right of action under Title IX of the Education Amendments of 1972, 86 Stat. 373, as amended, 20 U. S. C. § 1681 *et seq.* (Title IX), for the sexual harassment of a student by one of the district's teachers. We conclude that damages may not be recovered in those circumstances unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct.

I

In the spring of 1991, when petitioner Alida Star Gebser was an eighth-grade student at a middle school in respondent Lago Vista Independent School District (Lago Vista), she joined a high school book discussion group led by Frank Waldrop, a teacher at Lago Vista's high school. Lago Vista received federal funds at all pertinent times. During the book discussion sessions, Waldrop often made sexually suggestive comments to the students. Gebser entered high school in the fall and was assigned to classes taught by Waldrop in both semesters. Waldrop continued to make inappropriate

*Briefs of *amici curiae* urging reversal were filed for the National Education Association by *Michael D. Simpson* and *Laurence Gold;* and for the National Women's Law Center et al. by *Jacqueline R. Denning, Nancy L. Perkins,* and *Marcia D. Greenberger.*

Briefs of *amici curiae* urging affirmance were filed for the American Insurance Association by *William J. Kilberg, Craig A. Berrington,* and *Phillip L. Schwartz;* for the Kentucky School Boards Association by *Michael A. Owsley* and *Regina Abrams;* for the National School Boards Association et al. by *Lisa A. Brown, Gwendolyn H. Gregory,* and *Cynthia Jahn;* and for the TASB Legal Assistance Fund by *Carolyn M. Hanahan.*

remarks to the students, and he began to direct more of his suggestive comments toward Gebser, including during the substantial amount of time that the two were alone in his classroom. He initiated sexual contact with Gebser in the spring, when, while visiting her home ostensibly to give her a book, he kissed and fondled her. The two had sexual intercourse on a number of occasions during the remainder of the school year. Their relationship continued through the summer and into the following school year, and they often had intercourse during class time, although never on school property.

Gebser did not report the relationship to school officials, testifying that while she realized Waldrop's conduct was improper, she was uncertain how to react and she wanted to continue having him as a teacher. In October 1992, the parents of two other students complained to the high school principal about Waldrop's comments in class. The principal arranged a meeting, at which, according to the principal, Waldrop indicated that he did not believe he had made offensive remarks but apologized to the parents and said it would not happen again. The principal also advised Waldrop to be careful about his classroom comments and told the school guidance counselor about the meeting, but he did not report the parents' complaint to Lago Vista's superintendent, who was the district's Title IX coordinator. A couple of months later, in January 1993, a police officer discovered Waldrop and Gebser engaging in sexual intercourse and arrested Waldrop. Lago Vista terminated his employment, and subsequently, the Texas Education Agency revoked his teaching license. During this time, the district had not promulgated or distributed an official grievance procedure for lodging sexual harassment complaints; nor had it issued a formal anti-harassment policy.

Gebser and her mother filed suit against Lago Vista and Waldrop in state court in November 1993, raising claims against the school district under Title IX, Rev. Stat. § 1979,

42 U. S. C. § 1983, and state negligence law, and claims against Waldrop primarily under state law. They sought compensatory and punitive damages from both defendants. After the case was removed, the United States District Court for the Western District of Texas granted summary judgment in favor of Lago Vista on all claims, and remanded the allegations against Waldrop to state court. In rejecting the Title IX claim against the school district, the court reasoned that the statute "was enacted to counter *policies* of discrimination . . . in federally funded education programs," and that "[o]nly if school administrators have some type of notice of the gender discrimination and fail to respond in good faith can the discrimination be interpreted as a *policy* of the school district." App. to Pet. for Cert. 6a–7a. Here, the court determined, the parents' complaint to the principal concerning Waldrop's comments in class was the only one Lago Vista had received about Waldrop, and that evidence was inadequate to raise a genuine issue on whether the school district had actual or constructive notice that Waldrop was involved in a sexual relationship with a student.

Petitioners appealed only on the Title IX claim. The Court of Appeals for the Fifth Circuit affirmed, *Doe* v. *Lago Vista Independent School Dist.*, 106 F. 3d 1223 (1997), relying in large part on two of its recent decisions, *Rosa H.* v. *San Elizario Independent School Dist.*, 106 F. 3d 648 (1997), and *Canutillo Independent School Dist.* v. *Leija*, 101 F. 3d 393 (1996), cert. denied, 520 U. S. 1265 (1997). The court first declined to impose strict liability on school districts for a teacher's sexual harassment of a student, reiterating its conclusion in *Leija* that strict liability is inconsistent with "the Title IX contract." 106 F. 3d, at 1225 (internal quotation marks omitted). The court then determined that Lago Vista could not be liable on the basis of constructive notice, finding that there was insufficient evidence to suggest that a school official should have known about Waldrop's relationship with Gebser. *Ibid.* Finally, the court refused to in-

voke the common law principle that holds an employer vicariously liable when an employee is "aided in accomplishing [a] tort by the existence of the agency relation," Restatement (Second) of Agency § 219(2)(d) (1957) (hereinafter Restatement), explaining that application of that principle would result in school district liability in essentially every case of teacher-student harassment. 106 F. 3d, at 1225–1226.

The court concluded its analysis by reaffirming its holding in *Rosa H.* that "school districts are not liable in tort for teacher-student [sexual] harassment under Title IX unless an employee who has been invested by the school board with supervisory power over the offending employee actually knew of the abuse, had the power to end the abuse, and failed to do so," 106 F. 3d, at 1226, and ruling that petitioners could not satisfy that standard. The Fifth Circuit's analysis represents one of the varying approaches adopted by the Courts of Appeals in assessing a school district's liability under Title IX for a teacher's sexual harassment of a student. See *Smith* v. *Metropolitan School Dist. Perry Twp.,* 128 F. 3d 1014 (CA7 1997); *Kracunas* v. *Iona College,* 119 F. 3d 80 (CA2 1997); *Doe* v. *Claiborne County,* 103 F. 3d 495, 513–515 (CA6 1996); *Kinman* v. *Omaha Public School Dist.,* 94 F. 3d 463, 469 (CA8 1996). We granted certiorari to address the issue, 522 U. S. 1011 (1997), and we now affirm.

II

Title IX provides in pertinent part: "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U. S. C. § 1681(a). The express statutory means of enforcement is administrative: The statute directs federal agencies that distribute education funding to establish requirements to effectuate the nondiscrimination mandate, and permits the agencies to enforce those requirements through "any . . . means authorized by law," including

ultimately the termination of federal funding. § 1682. The Court held in *Cannon* v. *University of Chicago*, 441 U. S. 677 (1979), that Title IX is also enforceable through an implied private right of action, a conclusion we do not revisit here. We subsequently established in *Franklin* v. *Gwinnett County Public Schools*, 503 U. S. 60 (1992), that monetary damages are available in the implied private action.

In *Franklin*, a high school student alleged that a teacher had sexually abused her on repeated occasions and that teachers and school administrators knew about the harassment but took no action, even to the point of dissuading her from initiating charges. See *id.*, at 63–64. The lower courts dismissed Franklin's complaint against the school district on the ground that the implied right of action under Title IX, as a categorical matter, does not encompass recovery in damages. We reversed the lower courts' blanket rule, concluding that Title IX supports a private action for damages, at least "in a case such as this, in which intentional discrimination is alleged." See *id.*, at 74–75. *Franklin* thereby establishes that a school district can be held liable in damages in cases involving a teacher's sexual harassment of a student; the decision, however, does not purport to define the contours of that liability.

We face that issue squarely in this case. Petitioners, joined by the United States as *amicus curiae*, would invoke standards used by the Courts of Appeals in Title VII cases involving a supervisor's sexual harassment of an employee in the workplace. In support of that approach, they point to a passage in *Franklin* in which we stated: "Unquestionably, Title IX placed on the Gwinnett County Public Schools the duty not to discriminate on the basis of sex, and 'when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor "discriminate[s]" on the basis of sex.' *Meritor Sav. Bank, FSB* v. *Vinson*, 477 U. S. 57, 64 (1986). We believe the same rule should apply when a teacher sexually harasses and abuses a student." *Id.*, at 75.

*Meritor Savings Bank, FSB* v. *Vinson,* 477 U. S. 57 (1986), directs courts to look to common law agency principles when assessing an employer's liability under Title VII for sexual harassment of an employee by a supervisor. See *id.,* at 72. Petitioners and the United States submit that, in light of *Franklin*'s comparison of teacher-student harassment with supervisor-employee harassment, agency principles should likewise apply in Title IX actions.

Specifically, they advance two possible standards under which Lago Vista would be liable for Waldrop's conduct. First, relying on a 1997 "Policy Guidance" issued by the Department of Education, they would hold a school district liable in damages under Title IX where a teacher is "'aided in carrying out the sexual harassment of students by his or her position of authority with the institution,'" irrespective of whether school district officials had any knowledge of the harassment and irrespective of their response upon becoming aware. Brief for Petitioners 36 (quoting Dept. of Education, Office for Civil Rights, Sexual Harassment Policy Guidance: Harrassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12034, 12039 (1997) (1997 Policy Guidance)); Brief for United States as *Amicus Curiae* 14. That rule is an expression of *respondeat superior* liability, *i. e.,* vicarious or imputed liability, see Restatement § 219(2)(d), under which recovery in damages against a school district would generally follow whenever a teacher's authority over a student facilitates the harassment. Second, petitioners and the United States submit that a school district should at a minimum be liable for damages based on a theory of constructive notice, *i. e.,* where the district knew or "should have known" about harassment but failed to uncover and eliminate it. Brief for Petitioners 28; Brief for United States as *Amicus Curiae* 15–16; see Restatement § 219(2)(b). Both standards would allow a damages recovery in a broader range of situations than the rule adopted by the

Court of Appeals, which hinges on actual knowledge by a school official with authority to end the harassment.

Whether educational institutions can be said to violate Title IX based solely on principles of *respondeat superior* or constructive notice was not resolved by *Franklin*'s citation of *Meritor*. That reference to *Meritor* was made with regard to the general proposition that sexual harassment can constitute discrimination on the basis of sex under Title IX, see *Oncale* v. *Sundowner Offshore Services, Inc.*, 523 U. S. 75, 80–81 (1998), an issue not in dispute here. In fact, the school district's liability in *Franklin* did not necessarily turn on principles of imputed liability or constructive notice, as there was evidence that school officials knew about the harassment but took no action to stop it. See 503 U. S., at 63–64. Moreover, *Meritor*'s rationale for concluding that agency principles guide the liability inquiry under Title VII rests on an aspect of that statute not found in Title IX: Title VII, in which the prohibition against employment discrimination runs against "an employer," 42 U. S. C. § 2000e–2(a), explicitly defines "employer" to include "any agent," § 2000e(b). See *Meritor, supra*, at 72. Title IX contains no comparable reference to an educational institution's "agents," and so does not expressly call for application of agency principles.

In this case, moreover, petitioners seek not just to establish a Title IX violation but to recover *damages* based on theories of *respondeat superior* and constructive notice. It is that aspect of their action, in our view, that is most critical to resolving the case. Unlike Title IX, Title VII contains an express cause of action, § 2000e–5(f), and specifically provides for relief in the form of monetary damages, § 1981a. Congress therefore has directly addressed the subject of damages relief under Title VII and has set out the particular situations in which damages are available as well as the maximum amounts recoverable. § 1981a(b). With respect to Title IX, however, the private right of action is judicially

implied, see *Cannon*, 441 U. S., at 717, and there is thus no legislative expression of the scope of available remedies, including when it is appropriate to award monetary damages. In addition, although the general presumption that courts can award any appropriate relief in an established cause of action, *e. g., Bell* v. *Hood*, 327 U. S. 678, 684 (1946), coupled with Congress' abrogation of the States' Eleventh Amendment immunity under Title IX, see 42 U. S. C. § 2000d–7, led us to conclude in *Franklin* that Title IX recognizes a damages remedy, 503 U. S., at 68–73; see *id.*, at 78 (SCALIA, J., concurring in judgment), we did so in response to lower court decisions holding that Title IX does not support damages relief at all. We made no effort in *Franklin* to delimit the circumstances in which a damages remedy should lie.

## III

Because the private right of action under Title IX is judicially implied, we have a measure of latitude to shape a sensible remedial scheme that best comports with the statute. See, *e. g., Musick, Peeler & Garrett* v. *Employers Ins. of Wausau*, 508 U. S. 286, 292–293 (1993); *Virginia Bankshares, Inc.* v. *Sandberg*, 501 U. S. 1083, 1104 (1991). That endeavor inherently entails a degree of speculation, since it addresses an issue on which Congress has not specifically spoken. See, *e. g., Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson*, 501 U. S. 350, 359 (1991). To guide the analysis, we generally examine the relevant statute to ensure that we do not fashion the scope of an implied right in a manner at odds with the statutory structure and purpose. See *Musick, Peeler*, 508 U. S., at 294–297; *id.*, at 300 (THOMAS, J., dissenting); *Virginia Bankshares, supra*, at 1102.

Those considerations, we think, are pertinent not only to the scope of the implied right, but also to the scope of the available remedies. See *Transamerica Mortgage Advisors, Inc.* v. *Lewis*, 444 U. S. 11 (1979); see also *Franklin, supra*,

at 77–78 (SCALIA, J., concurring in judgment). We suggested as much in *Franklin*, where we recognized "the general rule that all appropriate relief is available in an action brought to vindicate a federal right," but indicated that the rule must be reconciled with congressional purpose. 503 U. S., at 68. The "general rule," that is, "yields where necessary to carry out the intent of Congress or to avoid frustrating the purposes of the statute involved." *Guardians Assn.* v. *Civil Serv. Comm'n of New York City*, 463 U. S. 582, 595 (1983) (opinion of White, J.); cf., *Cannon*, 441 U. S, at 703 ("[A] private remedy should not be implied if it would frustrate the underlying purpose of the legislative scheme").

Applying those principles here, we conclude that it would "frustrate the purposes" of Title IX to permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principles of *respondeat superior* or constructive notice, *i. e.*, without actual notice to a school district official. Because Congress did not expressly create a private right of action under Title IX, the statutory text does not shed light on Congress' intent with respect to the scope of available remedies. *Franklin*, 503 U. S., at 71; *id.*, at 76 (SCALIA, J., concurring in judgment). Instead, "we attempt to infer how the [1972] Congress would have addressed the issue had the . . . action been included as an express provision in the" statute. *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 178 (1994) (internal quotation marks omitted); see *Musick, Peeler, supra*, at 294–295; *North Haven Bd. of Ed.* v. *Bell*, 456 U. S. 512, 529 (1982).

As a general matter, it does not appear that Congress contemplated unlimited recovery in damages against a funding recipient where the recipient is unaware of discrimination in its programs. When Title IX was enacted in 1972, the principal civil rights statutes containing an express right of action did not provide for recovery of monetary damages at all, instead allowing only injunctive and equitable relief. See 42

U. S. C. § 2000a–3(a) (1970 ed.); §§ 2000e–5(e), (g) (1970 ed., Supp. II). It was not until 1991 that Congress made damages available under Title VII, and even then, Congress carefully limited the amount recoverable in any individual case, calibrating the maximum recovery to the size of the employer. See 42 U. S. C. § 1981a(b)(3). Adopting petitioners' position would amount, then, to allowing unlimited recovery of damages under Title IX where Congress has not spoken on the subject of either the right or the remedy, and in the face of evidence that when Congress expressly considered both in Title VII it restricted the amount of damages available.

Congress enacted Title IX in 1972 with two principal objectives in mind: "[T]o avoid the use of federal resources to support discriminatory practices" and "to provide individual citizens effective protection against those practices." *Cannon, supra,* at 704. The statute was modeled after Title VI of the Civil Rights Act of 1964, see 441 U. S., at 694–696; *Grove City College* v. *Bell,* 465 U. S. 555, 566 (1984), which is parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs. See 42 U. S. C. § 2000d *et seq.* The two statutes operate in the same manner, conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds. See *Guardians,* 463 U. S., at 599 (opinion of White, J.); *id.,* at 609 (Powell, J., concurring in judgment); cf. *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1, 17 (1981).

That contractual framework distinguishes Title IX from Title VII, which is framed in terms not of a condition but of an outright prohibition. Title VII applies to all employers without regard to federal funding and aims broadly to "eradicat[e] discrimination throughout the economy." *Landgraf* v. *USI Film Products,* 511 U. S. 244, 254 (1994) (internal quo-

tation marks omitted). Title VII, moreover, seeks to "make persons whole for injuries suffered through past discrimination." *Ibid.* (internal quotation marks omitted). Thus, whereas Title VII aims centrally to compensate victims of discrimination, Title IX focuses more on "protecting" individuals from discriminatory practices carried out by recipients of federal funds. *Cannon, supra,* at 704. That might explain why, when the Court first recognized the implied right under Title IX in *Cannon,* the opinion referred to injunctive or equitable relief in a private action, see 441 U. S., at 705, and n. 38, 710, n. 44, 711, but not to a damages remedy.

Title IX's contractual nature has implications for our construction of the scope of available remedies. When Congress attaches conditions to the award of federal funds under its spending power, U. S. Const., Art. I, § 8, cl. 1, as it has in Title IX and Title VI, we examine closely the propriety of private actions holding the recipient liable in monetary damages for noncompliance with the condition. See *Franklin, supra,* at 74–75; *Guardians, supra,* at 596–603 (White, J.); see generally *Pennhurst, supra,* at 28–29. Our central concern in that regard is with ensuring that "the receiving entity of federal funds [has] notice that it will be liable for a monetary award." *Franklin, supra,* at 74. Justice White's opinion announcing the Court's judgment in *Guardians Assn.* v. *Civil Serv. Comm'n of New York City,* for instance, concluded that the relief in an action under Title VI alleging unintentional discrimination should be prospective only, because where discrimination is unintentional, "it is surely not obvious that the grantee was aware that it was administering the program in violation of the [condition]." 463 U. S., at 598. We confront similar concerns here. If a school district's liability for a teacher's sexual harassment rests on principles of constructive notice or *respondeat superior,* it will likewise be the case that the recipient of funds was unaware of the discrimination. It is sensible to as-

sume that Congress did not envision a recipient's liability in damages in that situation. See *Rosa H.*, 106 F. 3d, at 654 ("When the school board accepted federal funds, it agreed not to discriminate on the basis of sex. We think it unlikely that it further agreed to suffer liability whenever its employees discriminate on the basis of sex").

Most significantly, Title IX contains important clues that Congress did not intend to allow recovery in damages where liability rests solely on principles of vicarious liability or constructive notice. Title IX's express means of enforcement—by administrative agencies—operates on an assumption of actual notice to officials of the funding recipient. The statute entitles agencies who disburse education funding to enforce their rules implementing the nondiscrimination mandate through proceedings to suspend or terminate funding or through "other means authorized by law." 20 U. S. C. § 1682. Significantly, however, an agency may not initiate enforcement proceedings until it "has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." *Ibid.* The administrative regulations implement that obligation, requiring resolution of compliance issues "by informal means whenever possible," 34 CFR § 100.7(d) (1997), and prohibiting commencement of enforcement proceedings until the agency has determined that voluntary compliance is unobtainable and "the recipient . . . has been notified of its failure to comply and of the action to be taken to effect compliance," § 100.8(d); see § 100.8(c).

In the event of a violation, a funding recipient may be required to take "such remedial action as [is] deem[ed] necessary to overcome the effects of [the] discrimination." § 106.3. While agencies have conditioned continued funding on providing equitable relief to the victim, see, *e. g., North Haven*, 456 U. S., at 518 (reinstatement of employee), the regulations do not appear to contemplate a condition order-

ing payment of monetary damages, and there is no indication that payment of damages has been demanded as a condition of finding a recipient to be in compliance with the statute. See Brief for United States as *Amicus Curiae* in *Franklin* v. *Gwinnett County School District*, O. T. 1991, No. 90–918, p. 24. In *Franklin*, for instance, the Department of Education found a violation of Title IX but determined that the school district came into compliance by virtue of the offending teacher's resignation and the district's institution of a grievance procedure for sexual harassment complaints. 503 U. S., at 64, n. 3.

Presumably, a central purpose of requiring notice of the violation "to the appropriate person" and an opportunity for voluntary compliance before administrative enforcement proceedings can commence is to avoid diverting education funding from beneficial uses where a recipient was unaware of discrimination in its programs and is willing to institute prompt corrective measures. The scope of private damages relief proposed by petitioners is at odds with that basic objective. When a teacher's sexual harassment is imputed to a school district or when a school district is deemed to have "constructively" known of the teacher's harassment, by assumption the district had no actual knowledge of the teacher's conduct. Nor, of course, did the district have an opportunity to take action to end the harassment or to limit further harassment.

It would be unsound, we think, for a statute's *express* system of enforcement to require notice to the recipient and an opportunity to come into voluntary compliance while a judicially *implied* system of enforcement permits substantial liability without regard to the recipient's knowledge or its corrective actions upon receiving notice. Cf. *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S., at 180 ("[I]t would be 'anomalous to impute to Congress an intention to expand the plaintiff class for a judicially implied cause of action beyond the bounds it delineated for

comparable express causes of action'"), quoting *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 736 (1975). Moreover, an award of damages in a particular case might well exceed a recipient's level of federal funding. See Tr. of Oral Arg. 35 (Lago Vista's federal funding for 1992–1993 was roughly $120,000). Where a statute's express enforcement scheme hinges its most severe sanction on notice and unsuccessful efforts to obtain compliance, we cannot attribute to Congress the intention to have implied an enforcement scheme that allows imposition of greater liability without comparable conditions.

## IV

Because the express remedial scheme under Title IX is predicated upon notice to an "appropriate person" and an opportunity to rectify any violation, 20 U. S. C. § 1682, we conclude, in the absence of further direction from Congress, that the implied damages remedy should be fashioned along the same lines. An "appropriate person" under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination. Consequently, in cases like this one that do not involve official policy of the recipient entity, we hold that a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond.

We think, moreover, that the response must amount to deliberate indifference to discrimination. The administrative enforcement scheme presupposes that an official who is advised of a Title IX violation refuses to take action to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation. That framework finds a rough parallel in the standard of deliberate indifference. Under a lower standard, there would be a risk that the recipient would be liable in dam-

ages not for its own official decision but instead for its employees' independent actions. Comparable considerations led to our adoption of a deliberate indifference standard for claims under § 1983 alleging that a municipality's actions in failing to prevent a deprivation of federal rights was the cause of the violation. See *Board of Comm'rs of Bryan Cty.* v. *Brown*, 520 U. S. 397 (1997); *Canton* v. *Harris*, 489 U. S. 378, 388–392 (1989); see also *Collins* v. *Harker Heights*, 503 U. S. 115, 123–124 (1992).

Applying the framework to this case is fairly straightforward, as petitioners do not contend they can prevail under an actual notice standard. The only official alleged to have had information about Waldrop's misconduct is the high school principal. That information, however, consisted of a complaint from parents of other students charging only that Waldrop had made inappropriate comments during class, which was plainly insufficient to alert the principal to the possibility that Waldrop was involved in a sexual relationship with a student. Lago Vista, moreover, terminated Waldrop's employment upon learning of his relationship with Gebser. JUSTICE STEVENS points out in his dissenting opinion that Waldrop of course had knowledge of his own actions. See *post*, at 299, n. 8. Where a school district's liability rests on actual notice principles, however, the knowledge of the wrongdoer himself is not pertinent to the analysis. See Restatement § 280.

Petitioners focus primarily on Lago Vista's asserted failure to promulgate and publicize an effective policy and grievance procedure for sexual harassment claims. They point to Department of Education regulations requiring each funding recipient to "adopt and publish grievance procedures providing for prompt and equitable resolution" of discrimination complaints, 34 CFR § 106.8(b) (1997), and to notify students and others that "it does not discriminate on the basis of sex in the educational programs or activities which it operates," § 106.9(a). Lago Vista's alleged failure to comply with the

regulations, however, does not establish the requisite actual notice and deliberate indifference. And in any event, the failure to promulgate a grievance procedure does not itself constitute "discrimination" under Title IX. Of course, the Department of Education could enforce the requirement administratively: Agencies generally have authority to promulgate and enforce requirements that effectuate the statute's nondiscrimination mandate, 20 U. S. C. § 1682, even if those requirements do not purport to represent a definition of discrimination under the statute. *E. g., Grove City,* 465 U. S., at 574–575 (permitting administrative enforcement of regulation requiring college to execute an "Assurance of Compliance" with Title IX). We have never held, however, that the implied private right of action under Title IX allows recovery in damages for violation of those sorts of administrative requirements.

V

The number of reported cases involving sexual harassment of students in schools confirms that harassment unfortunately is an all too common aspect of the educational experience. No one questions that a student suffers extraordinary harm when subjected to sexual harassment and abuse by a teacher, and that the teacher's conduct is reprehensible and undermines the basic purposes of the educational system. The issue in this case, however, is whether the independent misconduct of a teacher is attributable to the school district that employs him under a specific federal statute designed primarily to prevent recipients of federal financial assistance from using the funds in a discriminatory manner. Our decision does not affect any right of recovery that an individual may have against a school district as a matter of state law or against the teacher in his individual capacity under state law or under 42 U. S. C. § 1983. Until Congress speaks directly on the subject, however, we will not hold a school district liable in damages under Title IX for a teacher's sexual harassment of a student absent actual notice and de-

liberate indifference. We therefore affirm the judgment of the Court of Appeals.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

The question that the petition for certiorari asks us to address is whether the Lago Vista Independent School District (respondent) is liable in damages for a violation of Title IX of the Education Amendments of 1972, 20 U. S. C. § 1681 *et seq.* (Title IX). The Court provides us with a negative answer to that question because respondent did not have actual notice of, and was not deliberately indifferent to, the odious misconduct of one of its teachers. As a basis for its decision, the majority relies heavily on the notion that because the private cause of action under Title IX is "judicially implied," the Court has "a measure of latitude" to use its own judgment in shaping a remedial scheme. See *ante,* at 284. This assertion of lawmaking authority is not faithful either to our precedents or to our duty to interpret, rather than to revise, congressional commands. Moreover, the majority's policy judgment about the appropriate remedy in this case thwarts the purposes of Title IX.

I

It is important to emphasize that in *Cannon* v. *University of Chicago,* 441 U. S. 677 (1979), the Court confronted a question of statutory construction. The decision represented our considered judgment about the intent of the Congress that enacted Title IX in 1972. After noting that Title IX had been patterned after Title VI of the Civil Rights Act of 1964, which had been interpreted to include a private right of action, we concluded that Congress intended to authorize the same private enforcement of Title IX. 441 U. S., at 694–698; see also *id.,* at 703 ("We have no doubt that Congress intended to create Title IX remedies comparable to those available under Title VI and that it understood Title VI as

authorizing an implied private cause of action for victims of the prohibited discrimination").[1]  As long as the intent of Congress is clear, an implicit command has the same legal force as one that is explicit.  The fact that a statute does not authorize a particular remedy "in so many words is no more significant than the fact that it does not in terms authorize execution to issue on a judgment recovered under [the statute]."  *Deckert* v. *Independence Shares Corp.*, 311 U. S. 282, 288 (1940).[2]

In *Franklin* v. *Gwinnett County Public Schools*, 503 U. S. 60 (1992), we unanimously concluded that Title IX authorized

---

[1] We explained: "In 1972 when Title IX was enacted, the critical language in Title VI had already been construed as creating a private remedy . . . .  It is always appropriate to assume that our elected representatives, like other citizens, know the law; in this case, because of their repeated references to Title VI and its modes of enforcement, we are especially justified in presuming both that those representatives were aware of the prior interpretation of Title VI and that that interpretation reflects their intent with respect to Title IX."  441 U. S., at 696–698.  We also observed that "during the period between the enactment of Title VI in 1964 and the enactment of Title IX in 1972, this Court had consistently found implied remedies—often in cases much less clear than this.  It was *after* 1972 that this Court decided *Cort* v. *Ash*[, 422 U. S. 66 (1975),] and the other cases cited by the Court of Appeals in support of its strict construction of the remedial aspect of the statute.  We, of course, adhere to the strict approach followed in our recent cases, but our evaluation of congressional action in 1972 must take into account its contemporary legal contest.  In sum, it is not only appropriate but also realistic to presume that Congress was thoroughly familiar with these unusually important precedents from this and other federal courts and that it expected its enactment to be interpreted in conformity with them."  *Id.*, at 698–699 (footnotes omitted).

[2] In *Consolidated Rail Corporation* v. *Darrone*, 465 U. S. 624 (1984), we unanimously concluded that comparable language in the statute prohibiting discrimination against the handicapped by federal grant recipients authorized a private right of action for the recovery of backpay.  That decision, like *Cannon*, relied on the fact that the comparable language in Title VI had authorized a private remedy.  See 465 U. S., at 626, 635.

a high school student who had been sexually harassed by a sports coach/teacher to recover damages from the school district. That conclusion was supported by two considerations. In his opinion for the Court, Justice White first relied on the presumption that Congress intends to authorize "all appropriate remedies" unless it expressly indicates otherwise. *Id.*, at 66.[3] He then noted that two amendments[4] to Title IX enacted after the decision in *Cannon* had validated *Cannon's* holding and supported the conclusion that "Congress did not intend to limit the remedies available in a suit brought under Title IX." 503 U. S., at 72. JUSTICE SCALIA, concurring in the judgment, agreed that Congress' amendment of Title IX to eliminate the States' Eleventh Amendment immunity, see 42 U. S. C. § 2000d–7(a)(1), must be read "not only 'as a validation of *Cannon's* holding,' *ante*, at 72, but also as an implicit acknowledgment that damages are available." 503 U. S., at 78.

---

[3] "In *Marbury* v. *Madison*, 1 Cranch 137, 163 (1803), for example, Chief Justice Marshall observed that our Government 'has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right.' This principle originated in the English common law, and Blackstone described it as 'a general and indisputable rule, that where there is a legal right, there is also a legal remedy, by suit or action at law, whenever that right is invaded.' 3 W. Blackstone, Commentaries 23 (1783). See also *Ashby* v. *White*, 1 Salk. 19, 21, 87 Eng. Rep. 808, 816 (Q. B. 1702) ('If a statute gives a right, the common law will give a remedy to maintain that right . . .')." *Franklin* v. *Gwinnett County Public Schools*, 503 U. S., at 66–67; see also *id.*, at 67 ("'A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied, according to a doctrine of the common law'") (quoting *Texas & Pacific R. Co.* v. *Rigsby*, 241 U. S. 33, 39 (1916)).

[4] See Rehabilitation Act Amendments of 1986, 42 U. S. C. § 2000d–7 (abrogating the States' Eleventh Amendment immunity); Civil Rights Restoration Act of 1987, 20 U. S. C. § 1687 (defining "program or activity" broadly).

Because these constructions of the statute have been accepted by Congress and are unchallenged here, they have the same legal effect as if the private cause of action seeking damages had been explicitly, rather than implicitly, authorized by Congress. We should therefore seek guidance from the text of the statute and settled legal principles rather than from our views about sound policy.

## II

We have already noted that the text of Title IX should be accorded "'a sweep as broad as its language.'" *North Haven Bd. of Ed.* v. *Bell,* 456 U. S. 512, 521 (1982) (quoting *United States* v. *Price,* 383 U. S. 787 (1966)). That sweep is broad indeed. "No person . . . shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U. S. C. § 1681(a). As Judge Rovner has correctly observed, the use of passive verbs in Title IX, focusing on the victim of the discrimination rather than the particular wrongdoer, gives this statute broader coverage than Title VII. See *Smith* v. *Metropolitan School Dist. Perry Twp.,* 128 F. 3d 1014, 1047 (CA7 1997) (dissenting opinion).[5]

---

[5] "Unlike Title VII . . . , which focuses on the discriminator, making it unlawful for an employer to engage in certain prohibited practices (*see* 42 U. S. C. § 2000e–2(a)), Title IX is drafted from the perspective of the person discriminated against. That statute names no actor, but using passive verbs, focuses on the setting in which the discrimination occurred. In effect, the statute asks but a single question—whether an individual was subjected to discrimination *under* a covered program or activity. . . . And because Title IX as drafted includes no actor at all, it necessarily follows that the statute also would not reference 'agents' of that non-existent actor." *Smith* v. *Metropolitan School Dist. Perry Twp.,* 128 F. 3d, at 1047; see also *Cannon* v. *University of Chicago,* 441 U. S. 677, 691–693 (1979) (recognizing that Congress drafted Title IX "with an unmistakable focus on the benefited class," and did not "writ[e] it simply as a ban on discriminatory conduct by recipients of federal funds or as a prohibition

Moreover, because respondent assumed the statutory duty set out in Title IX as part of its consideration for the receipt of federal funds, that duty constitutes an affirmative undertaking that is more significant than a mere promise to obey the law.

Both of these considerations are reflected in our decision in *Franklin.* Explaining why Title IX is violated when a teacher sexually abuses a student, we wrote:

> "Unquestionably, Title IX placed on the Gwinnett County Public Schools the duty not to discriminate on the basis of sex, and 'when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor "discriminate[s]" on the basis of sex.' *Meritor Sav. Bank, FSB* v. *Vinson,* 477 U. S. 57, 64 (1986). We believe the same rule should apply when a teacher sexually harasses and abuses a student. *Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought by statute to proscribe.*" 503 U. S., at 75 (emphasis added).

*Franklin* therefore stands for the proposition that sexual harassment of a student by a teacher violates the duty— assumed by the school district in exchange for federal funds—not to discriminate on the basis of sex, and that a student may recover damages from a school district for such a violation.

Although the opinion the Court announces today is not entirely clear, it does not purport to overrule *Franklin.* See *ante,* at 281 ("*Franklin* thereby establishes that a school district can be held liable in damages in cases involving a teacher's sexual harassment of a student"). Moreover, I do not understand the Court to question the conclusion that an intentional violation of Title IX, of the type we recognized in

---

against the disbursement of public funds to educational institutions engaged in discriminatory practices").

*Franklin,*[6] has been alleged in this case.[7]   During her freshman and sophomore years of high school, petitioner Alida Star Gebser was repeatedly subjected to sexual abuse by her teacher, Frank Waldrop, whom she had met in the eighth grade when she joined his high school book discussion group. Waldrop's conduct was surely intentional, and it occurred during, and as a part of, a curriculum activity in which he wielded authority over Gebser that had been delegated to him by respondent.   Moreover, it is undisputed that the activity was subsidized, in part, with federal moneys.

The Court nevertheless holds that the law does not provide a damages remedy for the Title IX violation alleged in this case because no official of the school district with "authority to institute corrective measures on the district's behalf" had actual notice of Waldrop's misconduct.   *Ante,* at 277.   That holding is at odds with settled principles of

---

[6] As the Court notes, the student in *Franklin*—unlike the student in this case—alleged that school administrators knew about the harassment but failed to act.   See *ante,* at 281; *Franklin* v. *Gwinnett County Schools,* 503 U. S., at 64.   The *Franklin* opinion does not suggest, however, that that allegation was relevant to its holding that the school district could be liable in damages for an intentional violation of Title IX as a result of teacher-student harassment.

[7] Cf. Brief for Respondent 9 ("It is important to bear in mind that the question in this case is not whether school districts are somehow 'responsible' for violations of Title IX and for failure to comply with administrative procedures.   The issue is in what circumstances a school district may be compelled to answer *in damages* for a violation of Title IX or its implementing regulations"); *id.,* at 13 ("In sum, the manner in which Title IX is phrased simply determines that a violation of the statute may occur whenever a person is discriminated against on the basis of sex, regardless of the school district's knowledge of the discrimination.   But nothing in the language of the statute indicates that a school district must respond in damages for every such violation, regardless of its own knowledge or culpability").   But see *id.,* at 19 ("[T]here is no evidence that Lago Vista committed an intentional violation of Title IX").

agency law,[8] under which the district is responsible for Waldrop's misconduct because "he was aided in accomplishing the tort by the existence of the agency relation." Restatement (Second) of Agency § 219(2)(d) (1957).[9] This case presents a paradigmatic example of a tort that was made possible, that was effected, and that was repeated over a prolonged period because of the powerful influence that Waldrop had over Gebser by reason of the authority that his employer, the school district, had delegated to him. As a secondary school teacher, Waldrop exercised even greater authority and control over his students than employers and supervisors exercise over their employees. His gross misuse of that authority allowed him to abuse his young student's trust.[10]

---

[8] The Court's holding is also questionable as a factual matter. Waldrop himself surely had ample authority to maintain order in the classes that he conducted. Indeed, that is a routine part of every teacher's responsibilities. If Gebser had been the victim of sexually harassing conduct by other students during those classes, surely the teacher would have had ample authority to take corrective measures. The fact that he did not prevent his own harassment of Gebser is the consequence of his lack of will, not his lack of authority.

[9] The Court suggests that agency principles are inapplicable to this case because Title IX does not expressly refer to an "agent," as Title VII does. See ante, at 283 (citing 42 U. S. C. § 2000e(b)). Title IX's focus on the protected class rather than the fund recipient fully explains the statute's failure to mention "agents" of the recipient, however. See n. 5, supra. Moreover, in Meritor Savings Bank, FSB v. Vinson, 477 U. S. 57 (1986), we viewed Title VII's reference to an "agent" as a limitation on the liability of the employer: "Congress' decision to define 'employer' to include any 'agent' of an employer, 42 U. S. C. § 2000e(b), surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible." Id., at 72.

[10] For example, Waldrop first sexually abused Gebser when he visited her house on the pretense of giving her a book that she needed for a school project. See App. 54a (deposition of Alida Star Gebser). Gebser, then a high school freshman, stated that she "was terrified": "He was the main teacher at the school with whom I had discussions, and I didn't know what

Reliance on the principle set out in § 219(2)(b) of the Restatement comports with the relevant agency's interpretation of Title IX. The United States Department of Education, through its Office for Civil Rights, recently issued a policy "Guidance" stating that a school district is liable under Title IX if one of its teachers "was aided in carrying out the sexual harassment of students by his or her position of authority with the institution." Sexual Harassment Policy Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12034, 12039 (1997). As the agency charged with administering and enforcing Title IX, see 20 U. S. C. § 1682, the Department of Education has a special interest in ensuring that federal funds are not used in contravention of Title IX's mandate. It is therefore significant that the Department's interpretation of the statute wholly supports the conclusion that respondent is liable in damages for Waldrop's sexual abuse of his student, which was made possible only by Waldrop's affirmative misuse of his authority as her teacher.

The reason why the common law imposes liability on the principal in such circumstances is the same as the reason why Congress included the prohibition against discrimination on the basis of sex in Title IX: to induce school boards to adopt and enforce practices that will minimize the danger that vulnerable students will be exposed to such odious behavior. The rule that the Court has crafted creates the opposite incentive. As long as school boards can insulate themselves from knowledge about this sort of conduct, they

---

to do." *Id.*, at 56a. Gebser was the only student to attend Waldrop's summer advanced placement course, and the two often had sexual intercourse during the time allotted for the class. See *id.*, at 60a. Gebser stated that she declined to report the sexual relationship because "if I was to blow the whistle on that, then I wouldn't be able to have this person as a teacher anymore." *Id.*, at 62a. She also stated that Waldrop "was the person in Lago administration ... who I most trusted, and he was the one that I would have been making the complaint against." *Id.*, at 63a.

can claim immunity from damages liability.[11]  Indeed, the rule that the Court adopts would preclude a damages remedy even if every teacher at the school knew about the harassment but did not have "authority to institute corrective measures on the district's behalf." *Ante,* at 277.  It is not my function to determine whether this newly fashioned rule is wiser than the established common-law rule.  It is proper, however, to suggest that the Court bears the burden of justifying its rather dramatic departure from settled law, and to explain why its opinion fails to shoulder that burden.

## III

The Court advances several reasons why it would "frustrate the purposes" of Title IX to allow recovery against a school district that does not have actual notice of a teacher's sexual harassment of a student. *Ante,* at 285 (internal quotation marks omitted).  As the Court acknowledges, however, the two principal purposes that motivated the enactment of Title IX were: (1) " 'to avoid the use of federal resources to support discriminatory practices' "; and (2) " 'to provide individual citizens effective protection against those practices.' " *Ante,* at 286 (quoting *Cannon,* 441 U. S., at 704).  It seems quite obvious that both of those purposes would be served—not frustrated—by providing a damages remedy in a case of this kind.  To the extent that the Court's reasons for its policy choice have any merit, they suggest that no damages should ever be awarded in a Title IX case— in other words, that our unanimous holding in *Franklin* should be repudiated.

---

[11] The Court concludes that its holding "does not affect any right of recovery that an individual may have against a school district as a matter of state law or against the teacher in his individual capacity under state law or under 42 U. S. C. § 1983." *Ante,* at 292.  In this case, of course, the District Court denied petitioners' § 1983 claim on summary judgment, and it is undisputed that the Texas Tort Claims Act, Tex. Civ. Prac. & Rem. Code Ann. § 101.051 (1997), immunizes school districts from tort liability in cases like this one.

First, the Court observes that at the time Title IX was enacted, "the principal civil rights statutes containing an express right of action did not provide for recovery of monetary damages at all." *Ante*, at 285. *Franklin*, however, forecloses this reevaluation of legislative intent; in that case, we "evaluate[d] the state of the law when the Legislature passed Title IX," 503 U. S., at 71, and concluded that "the same contextual approach used to justify an implied right of action more than amply demonstrates the lack of any legislative intent to abandon the traditional presumption in favor of all available remedies," *id.*, at 72. The Court also suggests that the fact that Congress has imposed a ceiling on the amount of damages that may be recovered in Title VII cases, see 42 U. S. C. § 1981a, is somehow relevant to the question whether any damages at all may be awarded in a Title IX case. *Ante*, at 286. The short answer to this creative argument is that the Title VII ceiling does not have any bearing on when damages may be recovered from a defendant in a Title IX case. Moreover, this case does not present any issue concerning the amount of any possible damages award.[12]

Second, the Court suggests that the school district did not have fair notice when it accepted federal funding that it might be held liable "'for a monetary award'" under Title IX. *Ante*, at 287 (quoting *Franklin*, 503 U. S., at 74). The Court cannot mean, however, that respondent was not

---

[12] The lower courts are not powerless to control the size of damages verdicts. See n. 18, *infra*. Courts retain the power to order a remittitur, for example. In addition, the size of a jury verdict presumably would depend on several factors, at least some of which a school district could control. For example, one important factor might be whether the district had adopted and disseminated an effective policy on sexual harassment. See also Dept. of Education, Office for Civil Rights, Sexual Harrassment Policy Guidance: Harrassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12034, 12048, n. 35 (1997) ("[A] school's immediate and appropriate remedial actions are relevant in determining the nature and extent of the damages suffered by a plaintiff").

on notice that sexual harassment of a student by a teacher constitutes an "intentional" violation of Title IX for which damages are available, because we so held shortly before Waldrop began abusing Gebser. See *id.*, at 74–75. Given the fact that our holding in *Franklin* was unanimous, it is not unreasonable to assume that it could have been foreseen by counsel for the recipients of Title IX funds. Moreover, the nondiscrimination requirement set out in Title IX is clear, and this Court held that sexual harassment constitutes intentional sex discrimination long before the sexual abuse in this case began. See *Meritor Savings Bank, FSB* v. *Vinson,* 477 U. S. 57, 64 (1986). Normally, of course, we presume that the citizen has knowledge of the law.

The majority nevertheless takes the position that a school district that accepts federal funds under Title IX should not be held liable in damages for an intentional violation of that statute if the district itself "was unaware of the discrimination." *Ante,* at 287. The Court reasons that because administrative proceedings to terminate funding cannot be commenced until after the grant recipient has received notice of its noncompliance and the agency determines that voluntary compliance is not possible, see 20 U. S. C. § 1682, there should be no damages liability unless the grant recipient has actual notice of the violation (and thus an opportunity to end the harassment). See *ante,* at 288–290.

The fact that Congress has specified a particular administrative procedure to be followed when a subsidy is to be terminated, however, does not illuminate the question of what the victim of discrimination on the basis of sex must prove in order to recover damages in an implied private right of action. Indeed, in *Franklin,* 503 U. S., at 64, n. 3, we noted that the Department of Education's Office of Civil Rights had declined to terminate federal funding of the school district at issue—despite its finding that a Title IX violation had occurred—because the "district [had come] into compliance" with Title IX after the harassment at issue. See *ante,* at

289. That fact did not affect the Court's analysis, much less persuade the Court that a damages remedy was unavailable. Cf. *Cannon*, 441 U. S., at 711 ("The fact that other provisions of a complex statutory scheme create express remedies has not been accepted as a sufficient reason for refusing to imply an otherwise appropriate remedy under a separate section").

The majority's inappropriate reliance on Title IX's administrative enforcement scheme to limit the availability of a damages remedy leads the Court to require not only actual knowledge on the part of "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf," but also that official's "refus[al] to take action," or "deliberate indifference" toward the harassment. *Ante*, at 290.[13] Presumably, few Title IX plaintiffs who have been victims of intentional discrimination will be able to recover damages under this exceedingly high standard. The Court fails to recognize that its holding will virtually "render inutile causes of action authorized by Congress through a decision that *no* remedy is available." *Franklin*, 503 U. S., at 74.

## IV

We are not presented with any question concerning the affirmative defenses that might eliminate or mitigate the recovery of damages for a Title IX violation. It has been argued, for example, that a school district that has adopted and vigorously enforced a policy that is designed to prevent sexual harassment and redress the harms that such conduct may produce should be exonerated from damages liability.[14]

---

[13] The only decisions the Court cites to support its adoption of such a stringent standard are cases arising under a quite different statute, 42 U. S. C. § 1983. See *ante*, at 291.

[14] See Brief for National Education Association as *Amicus Curiae* 15 (proposing affirmative defense that "the entity had adopted and has implemented an effective prevention and compliance program").

The Secretary of Education has promulgated regulations directing grant recipients to adopt such policies and disseminate them to students.[15] A rule providing an affirmative defense for districts that adopt and publish such policies pursuant to the regulations would not likely be helpful to respondent, however, because it is not at all clear whether respondent adopted any such policy,[16] and there is no evidence that such a policy was made available to students, as required by regulation.[17]

A theme that seems to underlie the Court's opinion is a concern that holding a school district liable in damages might deprive it of the benefit of the federal subsidy—that the damages remedy is somehow more onerous than a possible termination of the federal grant. See, e. g., ante, at 290 (stating that "an award of damages in a particular case might well exceed a recipient's level of federal funding"). It is possible, of course, that in some cases the recoverable damages, in either a Title IX action or a state-law tort action, would

---

[15] The school district must "adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints" of discrimination. 34 CFR § 106.8(b) (1997). The district also must inform students and their parents of Title IX's antidiscrimination requirement. § 106.9.

[16] Factual questions remain with respect to whether respondent had an adequate antidiscrimination policy. Compare App. 44a–45a (affidavit of superintendent/Title IX coordinator Virginia Collier) (stating that the district had a policy) with Plaintiffs' Motion for Partial Summary Judgment, Record 332; id., Exh. 2 (Collier deposition), at 42, 44 (stating that the district had no formal policy).

[17] The district's superintendent stated that she did not remember if any handbook alerting students to grievance procedures was disseminated to students. App. 72a–73a (Collier deposition). Moreover, Gebser herself stated: "If I had known at the beginning what I was supposed to do when a teacher starts making sexual advances towards me, I probably would have reported it. I was bewildered and terrified and I had no idea where to go from where I was." Id., at 64a–65a.

exceed the amount of a federal grant.[18]   That is surely not relevant to the question whether the school district or the injured student should bear the risk of harm—a risk against which the district, but not the student, can insure.   It is not clear to me why the well-settled rules of law that impose responsibility on the principal for the misconduct of its agents should not apply in this case.   As a matter of policy, the Court ranks protection of the school district's purse above the protection of immature high school students that those rules would provide.   Because those students are members of the class for whose special benefit Congress enacted Title IX, that policy choice is not faithful to the intent of the policymaking branch of our Government.

I respectfully dissent.

JUSTICE GINSBURG, with whom JUSTICE SOUTER and JUSTICE BREYER join, dissenting.

JUSTICE STEVENS' opinion focuses on the standard of school district liability for teacher-on-student harassment in secondary schools.   I join that opinion, which reserves the question whether a district should be relieved from damages liability if it has in place, and effectively publicizes and enforces, a policy to curtail and redress injuries caused by sexual harassment.   *Ante*, at 304–305.   I think it appropriate to answer that question for these reasons: (1) the dimensions of a claim are determined not only by the plaintiff's

---

[18] *Amici curiae* National School Boards Association and the New Jersey School Boards Association point to a $1.4 million verdict in a recent Title IX case.   See Brief for National School Boards Association et al. as *Amici Curiae* 5, and n. 4 (citing *Canutillo Independent School Dist.* v. *Leija*, 101 F. 3d 393 (CA5 1996), cert. denied, 520 U. S. 1265 (1997)); see also Brief for TASB Legal Assistance Fund et al. as *Amici Curiae* 23 (same).   Significantly, however, the District Judge in that case refused to enter a judgment on that verdict; the judge instead ordered a new trial on damages, limited to medical and mental health treatment and special education expenses.   See 887 F. Supp. 947, 957 (WD Tex. 1995), rev'd, 101 F. 3d 393 (CA5 1996).

allegations, but by the allowable defenses; (2) this Court's pathmarkers are needed to afford guidance to lower courts and school officials responsible for the implementation of Title IX.

In line with the tort law doctrine of avoidable consequences, see generally C. McCormick, Law of Damages 127–159 (1935), I would recognize as an affirmative defense to a Title IX charge of sexual harassment, an effective policy for reporting and redressing such misconduct. School districts subject to Title IX's governance have been instructed by the Secretary of Education to install procedures for "prompt and equitable resolution" of complaints, 34 CFR § 106.8(b) (1997), and the Department of Education's Office of Civil Rights has detailed elements of an effective grievance process, with specific reference to sexual harassment, 62 Fed. Reg. 12034, 12044–12045 (1997).

The burden would be the school district's to show that its internal remedies were adequately publicized and likely would have provided redress without exposing the complainant to undue risk, effort, or expense. Under such a regime, to the extent that a plaintiff unreasonably failed to avail herself of the school district's preventive and remedial measures, and consequently suffered avoidable harm, she would not qualify for Title IX relief.