[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 15, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-12734

_____

D.C. Docket No. 03-62133-CV-ASG

ANDREW SALTZMAN,
VICKI SALTZMAN,

Plaintiffs-Appellants,

versus

BOARD OF COMMISSIONERS OF THE NORTH BROWARD HOSPITAL
DISTRICT, d.b.a. Rehabilitation Services, d.b.a North Broward Medical Center,
HOSPITAL CORPORATION OF AMERICA, d.b.a. Northwest Medical Center,
NORTHWEST MEDICAL CENTER, INC.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(June 15, 2007)**

Before BIRCH and FAY, Circuit Judges, and DUFFEY,* District Judge.

PER CURIAM

_____
        *Honorable William S. Duffey, Jr., United States District Judge for the Northern District
of Georgia, sitting by designation.

At issue before the Court is whether the district court erred when it granted summary judgment in favor of the Appellee Northwest Medical Center, Inc. ("Northwest"). We conclude that no reasonable jury could find that Northwest's treatment of Appellant Andrew Saltzman ("Mr. Saltzman") or his wife ("Mrs. Saltzman", collectively, "the Saltzmans") constituted intentional discrimination under the Rehabilitation Act. The district court correctly granted summary judgment in Northwest's favor on the Rehabilitation Act claims. Accordingly, we affirm.

## I. BACKGROUND

This case arises from Mr. Saltzman's stay at a facility owned by Northwest in February of 2002. Mr. Saltzman and his wife are deaf. On February 9, 2002, Mr. Saltzman experienced chest pain, dizziness, and shortness of breath. Mr. Saltzman was taken by ambulance to Northwest, which diagnosed him as having suffered a stroke. Mr. Saltzman remained at Northwest for four days. After he was stabilized, he was transferred to North Broward Medical Center for therapy and rehabilitation.

Mr. Saltzman and his wife communicate primarily through American Sign Language. They can read and write simple words in English, but their typical written communication consists of word strings without grammatical or syntactical

2

structure.  The Saltzmans have two adult children, Robbie and Sheri.  Robbie and Sheri have normal hearing and can communicate in American Sign Language, although Sheri is more proficient.  Prior to the events at issue in this case Sheri often accompanied Mr. Saltzman to doctors' appointments to translate for him, but she professes not to be able to convey medical terminology through sign language.

On February 10, 2002, Mrs. Saltzman used a TTY machine to call 911 emergency services regarding Mr. Saltzman's symptoms.  When the ambulance arrived, Mrs. Saltzman wrote Mr. Saltzman's name, general medical history, medications, contact information, and symptoms on a piece of paper. Mrs. Saltzman also wrote that they were deaf, that they needed an interpreter, and requested that one be available at the hospital.

At the time of Mr. Saltzman's arrival, Northwest had a policy for accommodating disabled patients.  The policy contained specific provisions for treating hearing-impaired patients like the Saltzmans, including listing contact information for two organizations to provide sign language interpreting services. The policy also provided that Northwest have TTY phones for the hearing impaired.  Northwest also is a stroke specialty center.  As such, its employees have training and experience in communicating with patients suffering stroke-related hearing or speech impediments.  Northwest's staff often engage in non-verbal

3

communication with disabled stroke patients using gestures, writing, fingerspelling, or other aides.

After Mr. Saltzman arrived at Northwest, staff treated him immediately and performed diagnostic work including a CT scan, EKG, and MRI. Northwest physicians diagnosed Mr. Saltzman as having suffered a stroke and admitted him for monitoring. Although the Saltzmans claim that Northwest's staff had some difficulty communicating with Mr. Saltzman, and particularly communicating to him the nature of his condition, the Saltzmans do not complain about the medical treatment Mr. Saltzman received.

No sign language interpreter was available the day the Saltzmans arrived at Northwest. On February 12, two days after Mr. Saltzman's admission, his daughter Sheri arrived. Sheri requested a sign language interpreter. From the time of her arrival until Mr. Saltzman's discharge on February 15, Sheri requested an interpreter every day and once gave a Northwest staff member a business card with an interpreter's name and phone number. Sheri assisted in translating for her parents as she was able.

Northwest staff informed the Saltzmans that they would try to locate an interpreter. A notation in Mr. Saltzman's medical records shows that Northwest staff called the League for the Hard of Hearing, one of the two organizations listed

4

in Northwest's accommodation policy. Northwest employees were unable to coordinate the unpredictable schedule of Mr. Saltzman's treating physician with the interpreter's schedule. Northwest's staff apparently did not attempt to contact the other listed agency, nor did they make further attempts to work with the League for the Hard of Hearing. It is undisputed that Northwest did not provide an interpreter during Mr. Saltzman's stay.

After four days of care, Mr. Saltzman was released to North Broward Medical Center for therapy and rehabilitation. Although Northwest did not provide a sign language interpreter, staff members communicated to Mr. Saltzman and his wife, using fingerspelling, writing, and hand signals, that Mr. Saltzman had suffered a stroke, but that he was going to be "okay." The Saltzmans were unable to comprehend fully the meaning of the written term "stroke," and their claim is based on the isolation and fear Mr. Saltzman experienced due to the claimed ineffectiveness of their attempts to communicate.

## II. PRIOR PROCEEDINGS

On November 26, 2003, the Saltzmans filed the present suit against Northwest and North Broward Medical Center, alleging violations of Title III of the Americans with Disabilities Act ("ADA"), § 504 of the Rehabilitation Act, intentional infliction of emotional distress, and violations of Florida statutory law.

5

The district court dismissed the ADA and state statutory counts, leaving only the Rehabilitation Act and intentional infliction of emotional distress claims. Northwest filed a motion for summary judgment on those counts, which the district court granted. The Saltzmans appealed the district court's grant of summary judgment in Northwest's favor on the Rehabilitation Act claim.

### III. DISCUSSION

A. Standard of Review

"We review de novo the district court's grant of summary judgment . . . , applying the same familiar standards as the district court." Patrick v. Floyd Med. Ctr., 201 F.3d 1313, 1315 (11th Cir. 2000) (citation omitted). "Summary judgment is appropriate if the record shows no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Gitlitz v. Compagnie Nationale Air France, 129 F.3d 554, 556 (11th Cir.1997) (per curiam) (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 127 S. Ct 1769, 1776 (2007) (quotations omitted).

B. Rehabilitation Act Claim

The issue in this appeal is whether Northwest's failure to provide a sign language interpreter constitutes discrimination under § 504 of the Rehabilitation Act, 29 U.S.C. § 794, entitling the Saltzmans to compensatory damages.

Federal regulations enacted pursuant to the Rehabilitation Act require the provision of "appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question." 45 C.F.R. § 84.52(d)(1). Auxiliary aids are "appropriate" if they ensure "effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c). The term "auxiliary aids" is not confined to interpreters, but also includes:

> notetakers, computer-aided transcription services, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments.

Id. at § 36.303(b)(1).

In this Circuit, compensatory damages are recoverable for Rehabilitation Act claims only upon a showing of intentional discrimination. Wood v. President & Trs. of Spring Hill College, 978 F.2d 1214, 1219 (11th Cir. 1992). We have not

determined whether "intentional discrimination" should be evaluated under the "deliberate indifference" standard, or under a more stringent standard, such as "discriminatory animus." Bircoll v. Miami-Dade County, 480 F.3d 1072, 1080-81 (11th Cir. 2007). The district court decided this issue under the deliberate indifference standard, the parties briefed the issue on appeal under that standard, and this Court uses the same standard. Because the Saltzmans cannot show intentional discrimination as a matter of law under the lenient deliberate indifference standard, summary judgment in Northwest's favor is appropriate regardless of whether a more stringent standard should apply.[1]

Deliberate indifference requires knowledge that a federally protected right is likely to be harmed and a failure to act upon that likelihood. See City of Canton, Ohio v. Harris, 489 U.S. 378, 388-89 (1989). Negligence, even if gross, cannot constitute deliberate indifference. See Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005). For conduct to be deliberately indifferent, there must be both knowledge of likely harm and failure to act on the part of a policymaker, that is, someone capable of making an "official decision" on behalf of the organization. Gebser v. Lago Vista Independent School Dist., 524 U.S. 274, 290-91 (1998).

---

[1] Our holding does not require us to determine a specific standard for determining intentional discrimination under the Rehabilitation Act, and we decline to do so. We leave determination of that issue for another day.

Construing the facts in the light most favorable to the Saltzmans, no reasonable juror could find that Northwest's conduct constituted intentional discrimination. Northwest had a policy in place for assisting hearing-impaired patients, including provision of TTY phones and a list of interpreting services to call. There is no evidence that any Northwest policymaker intended or expected hearing impaired people would be discriminated against in their hospital. There also is no evidence that any policymaker expected any member of the hospital staff would not follow the hospital's disability policy. The facts are that pursuant to its policy, Northwest employees attempted to locate an interpreter for the Saltzmans. Although that attempt may have been negligently made, negligence is not intentional discrimination. There is no indication that Northwest's hearing-impaired accommodation policy was inadequate, or that Northwest had a practice of not following the written policy[2] it had enacted.

Northwest, as a specialty stroke center, also had in place a variety of other auxiliary aids for nonverbal communication, in which the staff were trained and

[2] The Saltzmans allege that official knowledge of the inadequacy of Northwest's accommodation policy and practice is demonstrated by the comprehensive policy it agreed to implement as part of a settlement in the case Access Now, Inc. v. Ambulatory Surgery Center Group, Ltd., et. al., Case No. 99-109-CIV-Seitz/Garber (S.D. Fla.). The record shows, however, that Northwest did not enter into the settlement requiring a new policy until nearly six months after the Saltzmans' visit. Whatever knowledge can be implied from the fact of the settlement does not apply to the time frame of Mr. Saltzman's visit.

experienced. Northwest staff used fingerspelling, hand gestures, written communication, and other means to communicate with the Saltzmans. While these communications may not have been as effective as the Saltzmans would have preferred, the fact that Northwest's staff would offer such a broad range of auxiliary aids, while seeking the services of a qualified interpreter, support the record's clear showing that Northwest did not intend to discriminate against the Saltzmans or any other hearing impaired person because of their disability, and there is no evidence that Northwest officials believed there was a likelihood of such discrimination. To the contrary, the undisputed facts show that Northwest took seriously its duty to accommodate hearing-impaired patients, even if in this particular instance its efforts to find an interpreter came up short.

## IV.  CONCLUSION

For the reasons stated above, the Court finds that the district court correctly decided the Motion for Summary Judgment and the District Court's decision is **AFFIRMED.**