# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1817

_____

| | | |
|---|---|---|
| Julie Grandson, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | |
| Jennifer A. Thompson; Renata D. | * | |
| Lindahl; Ginger M. Jeffries, | * | |
| individually and on behalf of all | * | Appeal from the United States |
| others similarly situated, | * | District Court for the |
| | * | District of Minnesota. |
| Plaintiffs - Appellants, | * | |
| | * | |
| v. | * | |
| | * | |
| University of Minnesota, et al., | * | |
| | * | |
| Defendants - Appellees. | * | |

_____

Submitted: April 12, 2001

Filed: November 20, 2001

_____

Before WOLLMAN, Chief Judge, McMILLIAN and LOKEN, Circuit Judges.

_____

LOKEN, Circuit Judge.

These are two actions against the University of Minnesota, its Board of Regents, and current and former administrators of the University's Duluth campus ("UMD") under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-

1688 ("Title IX"). Plaintiffs seek injunctive and damage relief for UMD's alleged unequal treatment of female student athletes. They appeal the district court's[1] orders striking the class action allegations in the second suit for failure to file a timely motion for class certification; denying those plaintiffs leave to amend their complaint to assert claims for money damages; and granting summary judgment dismissing all the individual plaintiffs' claims.[2] We conclude the district court did not abuse its discretion in striking the class action allegations. We agree with the district court that the individual plaintiffs lack standing to seek injunctive relief, and that their damage claims do not satisfy the rigorous standards of Gebser v. Lago Vista Ind. Sch. Dist., 524 U.S. 274 (1998). Accordingly, we affirm.

## I. Background.

**A. Title IX.** Patterned after Title VI of the Civil Rights Act of 1964, Title IX prohibits gender discrimination in education programs receiving federal financial assistance, including athletic programs. Section 901 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Section 902 authorizes federal funding agencies to promulgate regulations providing for the termination of federal funding of any noncomplying program or activity, "*Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the

---

[1]The HONORABLE PAUL A. MAGNUSON, then Chief Judge of the United States District Court for the District of Minnesota.

[2]This case was originally scheduled for oral argument in October 1999 but was deferred pending our en banc decision in Jim C. v. Ark. Dept. of Educ., 235 F.3d 1079 (8th Cir. 2000), cert. denied, 121 S. Ct. 2591 (2001). Jim C. precludes the University's Eleventh Amendment defense. See 235 F.3d at 1081 n.2.

requirement and has determined that compliance cannot be secured by voluntary means." 20 U.S.C. § 1682. Pursuant to this authority, the Department of Education has promulgated regulations addressing equal opportunity issues in the provision of athletic scholarships and programs. See 34 C.F.R. §§ 106.37(c), 106.41.

Though Congress was silent on the question of private remedies, the Supreme Court has implied a private right of action to enforce Title IX, Cannon v. Univ. of Chicago, 441 U.S. 677, 717 (1979), and has authorized the award of money damages, Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 76 (1992). However, in fashioning specific implied remedies, the Court recently cautioned, courts must "shape a sensible remedial scheme that best comports with the statute." Gebser, 524 U.S. at 284. In Gebser, the Court held that a school district is not liable for a teacher's sexual harassment unless it had actual notice of, and was deliberately indifferent to, the discrimination. The Court explained, 524 U.S. at 288-90:

> Title IX's express means of enforcement -- by administrative agencies -- operates on an assumption of actual notice to officials of the funding recipient. . . .
>
>                     \*     \*     \*     \*     \*
>
>     It would be unsound, we think, for a statute's *express* system of enforcement to require notice to the recipient and an opportunity to come into voluntary compliance while a judicially *implied* system of enforcement permits substantial liability without regard to the recipient's knowledge or its corrective actions upon receiving notice. . . . Where a statute's express enforcement scheme hinges its most severe sanction on notice and unsuccessful efforts to obtain compliance, we cannot attribute to Congress the intention to have an implied enforcement scheme that allows imposition of greater liability without comparable conditions.

**B. The Administrative Complaint Against UMD.** UMD receives federal funding and therefore must comply with Title IX. In September 1996, before these lawsuits were filed, the Office for Civil Rights of the United States Department of

Education ("OCR") notified UMD that a Title IX complaint had been filed alleging that UMD and its athletic department were violating Title IX by:

- not effectively accommodating the athletic interests and abilities of females;

- failing to provide female athletes with proportional athletic financial assistance; and

- failing to provide female athletes with equal opportunities for travel allowances, coaching, practice facilities, medical and training services, housing and dining, publicity services, and recruiting resources.

On April 2, 1997, UMD and OCR entered into an Agreement to resolve the September 1996 complaint. The Agreement required UMD to increase the squad size of its varsity teams for women, to provide women "equivalent opportunities to receive athletic financial assistance," and to provide women equivalent access to the other services and facilities enumerated in the complaint. The Agreement further required UMD to submit status reports to OCR on October 1, 1997, 1998, and 1999, and a final report on October 1, 2000, "documenting its full implementation of this Agreement." In November 2000, after UMD submitted those reports, OCR determined that UMD had fully implemented all provisions of the Agreement. OCR then terminated its administrative monitoring.

**C. These Actions Commence.** In February 1997, UMD student Julie Grandson filed the first action, seeking injunctive relief and compensatory damages for the scholarship and financial support she allegedly would have received as a member of the women's varsity soccer team had UMD not discriminated against female athletes. Three months later, Jennifer Thompson, Renata Lindahl, and Ginger M. Jeffries (collectively referred to as "Thompson Plaintiffs") filed the second action. The Thompson Plaintiffs purported to sue on behalf of a class of similarly

-4-

situated female students. They sought injunctive relief requiring UMD to end gender discrimination in its intercollegiate athletic program by increasing the total number of participation opportunities for women and by adding an NCAA Division I women's team.

At the time these actions were filed, UMD fielded seven varsity athletic teams for men and seven for women. All the varsity teams competed at the NCAA Division II level, except for men's ice hockey which was a Division I team. In 1999, as part of its Title IX compliance efforts under the OCR Agreement, UMD added a Division I women's ice hockey team. Earlier this year, that team won the first NCAA National Championship for women's ice hockey. See "UMD Earns NCAA Title," MPLS. STAR TRIB., Mar. 26, 2001, at C1.

**D. Procedural History.** On June 30, 1997, the Thompson Plaintiffs sought leave to amend their complaint to assert claims for money damages. The district court deferred that motion pending resolution of UMD's motion to dismiss, which was denied on March 16, 1998. Shortly thereafter, the court entered a revised scheduling order, as requested by plaintiffs, which set July 21, 1998, as the deadline for filing dispositive motions. UMD moved to strike the Thompson Plaintiffs' class allegations because the motion for class certification -- a dispositive motion under the district court's local rules -- had not been timely filed.

Following a hearing on July 23, Magistrate Judge Jonathan Lebedoff recommended that the district court grant UMD's motion to strike the class allegations. The district court adopted this recommendation. Judge Lebedoff also denied the Thompson Plaintiffs' motion to add money damage claims as futile. The district court affirmed this order. Finally, on February 2, 1999, the district court granted summary judgment dismissing the individual plaintiffs' remaining claims. The court ruled that the four plaintiffs lacked standing to seek injunctive relief because they had not played a varsity sport or had exhausted their NCAA eligibility.

The court dismissed Grandson's damage claim under <u>Gebser</u> because she did not allege that she complained to UMD officials about her alleged unequal treatment and did not support her allegation of disparate funding with "proof of intentional discrimination or deliberate disregard for women's athletics."

Describing these actions as suits "to end twenty years of pervasive and intentional gender discrimination in the intercollegiate athletic program" at UMD, plaintiffs appeal district court rulings striking their class allegations, denying their motion to add class-wide damage claims, and dismissing the individual claims for injunctive relief and damages.

## II. Discussion.

Plaintiffs complain of widespread intentional discrimination in the funding of women's varsity sports, in the allocation of athletic scholarships to men and women athletes, and in the spending of an annual Women's Special Allocation appropriated by the Minnesota Legislature. Though plaintiffs do not disclose the specific relief they seek, it is apparent they envision injunctive relief that would have the district court function as a *de facto* super-athletic department director, plus sweeping class-wide damage relief for all UMD women students who might have benefitted from a more generous funding of women's athletics.

There have been a number of reported Title IX cases challenging women's collegiate athletic programs, but to our knowledge this is the first case in which (i) a class action was brought after the relevant federal funding agency lodged a broad overlapping complaint against the university, (ii) plaintiffs seek class-wide injunctive relief over and above a university compliance program that the relevant funding agency has found to be fully adequate, and (iii) plaintiffs seek class-wide damages for alleged programmatic deficiencies that were voluntarily remedied when brought to the university's attention by the funding agency's complaint. Mindful of

the Supreme Court's admonition that we must "shape a sensible remedial scheme that best comports with the statute," we doubt that such sweeping claims would ever be sustained in these circumstances.[3]  But the most sweeping claims need not be addressed if the district court was correct in striking the Thompson Plaintiffs' class allegations and in denying the individual plaintiffs standing to seek injunctive relief. So we begin with those issues.

**A.  Striking the Class Allegations.**  The district court struck the Thompson Plaintiffs' class allegations because they failed to file a motion for class certification prior to the deadline for dispositive motions.  We review that ruling for abuse of discretion, recognizing "[t]he district court had the power to establish reasonable times for the filing of documents and if those deadlines were not met, the court had the discretion to dismiss all or part of the suit."  Burkhalter v. Montgomery Ward & Co., 676 F.2d 291, 294 (8th Cir. 1982).

A class certification motion shall be brought "[a]s soon as practicable after the commencement of an action brought as a class action."  Fed. R. Civ. P. 23(c)(1).  A motion for class certification is a dispositive motion under District of Minnesota Local Rule 7.1(b).  Here, the dispositive motions deadline was July 21, 1998, fifteen months after the Thompson Plaintiffs filed their initial complaint.  On July 9, 1998, they assured the court they would file a motion to extend the dispositive motions deadline "[w]ithin a few days and well before July 21."  They did not do so.  The

---

[3]In the Clean Water Act, Congress provided for administrative remedies and expressly authorized private citizen suits that supplement but do not supplant agency enforcement.  See 33 U.S.C. §§ 1319(g), 1365(b).  We construed these remedial provisions to mean that an informal administrative enforcement agreement precludes a citizen suit for inconsistent civil penalties.  Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc., 138 F.3d 351, 356-57 (8th Cir. 1998).  We read Gebser as requiring that an implied private action for systemic Title IX relief must likewise take a back seat to an agency proceeding that has led to satisfactory voluntary compliance.

Thompson Plaintiffs explain that they were waiting for a ruling on their motion to add claims for money damages. But the legitimacy of that excuse was an issue for the district court. The court struck the class action allegations after concluding that the Thompson Plaintiffs had "no credible excuse for neither seeking class certification before the deadline . . . nor seeking an extension of time" to do so. That ruling was well within its discretion. See Hall v. Bio-Med. App., Inc., 671 F.2d 300, 302-03 (8th Cir. 1982) (no abuse of discretion to strike class allegations for plaintiffs' failure to comply with local rule requiring class certification motion within ninety days after case is filed).

**B. The Claims for Injunctive Relief.** The district court held that each of the four individual plaintiffs lacked standing to seek prospective injunctive relief -- Grandson, Thompson, and Jeffries because they have no remaining NCAA eligibility, and Lindahl because she did not play on a varsity team, seeks to compel UMD to create a women's varsity ice hockey team, which it has already done, and has not attended UMD since 1998. Plaintiffs challenge this ruling as to Grandson but fail to address her lack of standing. That a plaintiff lacks eligibility or is no longer a student is an adequate basis to dismiss an individual Title IX claim for injunctive relief. See Cook v. Colgate Univ., 992 F.2d 17, 20 (2d Cir. 1993). Plaintiffs argue that Lindahl's claims are not moot because she left UMD for financial reasons and may return, and because UMD may drop or fail to fund its new Division I women's ice hockey team. These arguments are wholly speculative, particularly given UMD's compliance efforts at the behest of OCR. Thus, Lindahl's individual claim for injunctive relief is moot. See McFarlin v. Newport Spec. Sch. Dist., 980 F.2d 1208, 1210 (8th Cir. 1992) ("Through the passage of time and the occurrence of irrevocable events, disputes may disappear so that federal courts no longer can grant effective relief.").

**C. The Claims for Damage Relief.** The district court denied the Thompson Plaintiffs leave to amend to add Title IX damage claims, concluding they had failed

to state a cognizable claim for damages under <u>Gebser</u>.  The court subsequently dismissed Grandson's claim for money damages because she failed to allege that she complained to UMD about unequal treatment before suing, as <u>Gebser</u> requires, and because "a funding disparity between men's and women's teams by itself is insufficient to support [Title IX] unequal treatment claims."  Plaintiffs appeal both rulings.

**1.  The Thompson Plaintiffs.**  We review the district court's denial of leave to amend a complaint for abuse of discretion.  <u>Fuller v. Sec'y of Def.</u>, 30 F.3d 86, 88 (8th Cir.), <u>cert. denied</u>, 513 U.S. 1019 (1994).  Leave to amend will be denied if the proposed amended pleading would be futile.  <u>Wald v. Southwestern Bell Corp. Customcare Med. Plan</u>, 83 F.3d 1002, 1005 (8th Cir. 1996).

In <u>Gebser</u>, the Supreme Court noted that the express remedy in Title IX operates on an assumption of prior notice of alleged discrimination to the funding recipient and an opportunity to rectify any violation voluntarily.  524 U.S. at 288.  The Court therefore held that compensatory damages may not be recovered in cases of teacher-student sexual harassment unless a school official with authority to address the discrimination had actual notice of and was deliberately indifferent to the discrimination.  <u>Id.</u> at 290.  Here, the Thompson Plaintiffs' proposed amended complaint recited at length alleged disparities in the resources and opportunities afforded the women's and men's athletic programs, and then asserted in conclusory fashion that UMD has "intentionally violated Title IX by knowingly and deliberately discriminating."  There was no allegation of prior notice of their complaints to appropriate UMD officials, no allegation of deliberate indifference by such officials, and no allegation they had afforded UMD a reasonable opportunity to rectify the alleged violations.  The district court did not abuse its discretion in denying the Thompson Plaintiffs leave to amend to assert damage claims that would have been futile under <u>Gebser</u>.

**2. Grandson.** Grandson seeks money damages for scholarship and other financial support she allegedly would have received as a member of the UMD varsity women's soccer team if UMD had not discriminated against its women student athletes. The district court concluded that her damage claim fails under <u>Gebser</u> because she failed to allege that she complained to UMD about this alleged discrimination, and because Title IX does not prohibit unequal expenditures on men's and women's athletics.

On appeal, Grandson first argues that <u>Gebser</u>'s actual notice requirement is satisfied in her case by the numerous complaints UMD has received over the years since Title IX's enactment about the level of funding for women's athletics and the lack of women's varsity teams in sports such as swimming, ice hockey, and cross-country skiing. We disagree. A vigorous public debate on these issues does not demonstrate that UMD knew of systemic non-compliance. For example, OCR's 1979 Policy Interpretation stated that a university's compliance will be tested by whether men and women students are provided substantially proportionate opportunities, *or* whether the university can show "a history and continuing practice of program expansion" for an underrepresented gender, *or* whether it can show that members of an underrepresented gender "have been fully and effectively accommodated by the present program." 44 Fed. Reg. 71,413, 71,418 (1979), applied in <u>Cohen v. Brown Univ.</u>, 101 F.3d 155 (1st Cir. 1996), <u>cert. denied</u>, 520 U.S. 1186 (1997). These are flexible standards, and <u>Gebser</u> emphasized that money damages should not be awarded except for knowing violations. When an individual plaintiff such as Grandson claims money damages from a specific Title IX violation, such as failing to award her a soccer scholarship, <u>Gebser</u> requires prior notice to a university official with authority to address the complaint and a response demonstrating deliberate indifference to the alleged violation.

Grandson next argues that she did complain to the Director of UMD's Office of Equal Opportunity on August 15, 1996. However, this was after she had quit the

women's varsity soccer team. It was not evidence that she complained of monetary injury in timely fashion or that the responsible UMD officials were deliberately indifferent to her claim.

Grandson further argues that UMD's consistently unequal expenditures for its men's and women's athletic teams is sufficient evidence of the deliberate indifference required by Gebser. Again, we disagree. Title IX does not require parity of expenditures. See 34 C.F.R. § 106.41(c) ("[u]nequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams . . . will not constitute noncompliance"). Likewise, OCR's Policy Interpretation stated "that purely financial measures . . . do not in themselves offer conclusive documentation of discrimination." 44 Fed. Reg. at 71,414.

Grandson further argues that the disproportionately low athletic scholarships awarded to women is evidence of deliberate indifference. The Title IX regulations require that funding recipients "provide reasonable opportunities for [athletic scholarship] awards for members of each sex in proportion to the number of students of each sex participating in . . . intercollegiate athletics," 34 C.F.R. 106.37(c). But OCR construes this regulation as permitting recipients to phase in scholarships for newly created varsity teams. See 44 Fed. Reg. at 71,415. UMD started its women's varsity soccer team in 1994, the first of the two seasons Grandson was on the team.

On this record, UMD's response to the OCR Title IX complaint that preceded Grandson's lawsuit, and the efforts UMD made in fulfilling its commitments under the compliance Agreement with OCR, preclude a finding that UMD has been deliberately indifferent to its overall compliance obligations under Title IX. As Grandson did not give UMD officials prior notice of and an opportunity to rectify

the specific violations that she alleges injured her as a member of the women's varsity soccer team, the district court properly granted summary judgment dismissing her claim for money damages.

The judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.