*708 NIEMEYER, Circuit Judge,
dissenting:
This case raises the question of whether Melissa Jennings, a member of the University of North Carolina (“UNC”) women’s soccer team for the 1996 and 1997 seasons was, by reason of sexual discrimination, “deprive[d] ... of access to the educational opportunities or benefits provided by the school,” in violation of Title IX, 20 U.S.C. § 1681(a). Davis v. Monroe Co. Bd. of Educ., 526 U.S. 629, 650, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).
After being warned repeatedly about both her academic and athletic performance, Jennings was cut from .the soccer team in May 1998, before the beginning of the 1998 season. By her own account, Jennings did not want to leave the team, and she was not expecting to get cut but rather expected to hear that she had improved. At the time, Jennings’ cumulative grade point average was 1.964 on a 4.0 scale, up from the previous year’s 1.538. But she was still at or near the bottom of the team’s training performance levels and was a third-or fourth-string goalkeeper. She had played in only one regular season game during her first year and in one or two during her second year.
Only after Jennings was cut did her father write a letter to the general counsel of UNC, complaining about sexual harassment of his daughter during the previous two years. A few months later, Jennings commenced this action. The district court granted UNC’s motion for summary judgment, and I would affirm.
During the two-year period of which Jennings complains, she alleged no deprivation of an educational opportunity by reason of sexual discrimination. She does allege (1) much sexual talk during practices by teammates and her coach, Anson Dorrance; (2) two innocuous comments directed at her by teammates and Coach Dorrance; and (3) a conversation during her annual evaluation meeting during which Coach Dorrance was trying to understand the reasons for Jennings’ poor academic performance. He asked, “What is going on in [your] social life? Is that affecting [your] grades? Is that affecting [you] as a player? Who are you f**king? Is that affecting your grades?”
Jennings does not allege that she was cut from the soccer team because of sexual discrimination or that she played any less because of sexual discrimination. She also does not allege any touching, advances, or offers of sex. Her claim amounts to a complaint about the vulgarity of the pervasive locker room-style talk by teammates and her coach that attended team practices. In these circumstances, the district court was correct in concluding that the facts do not create a triable issue as to a violation of Title IX, and therefore, I respectfully dissent.
I
To give Jennings the full benefit of the facts in the summary judgment record, it is necessary to set them forth carefully and in some detail. This is especially important because Jennings (as well as the majority) has tended to rely on completely irrelevant incidents that occurred even before she entered UNC as a freshman; that she never knew about; and that she learned only from the testimony given in this case.[1]
*709 A
Melissa Jennings began playing goalkeeper on soccer teams when she was 12 years old. She performed so well that within a few years she was the first-string goalie on an elite youth soccer club. (J.A. 1199, 1200.) After graduating from high school, Jennings went on a recruiting trip to the University of Kansas and verbally committed to play for its women’s soccer team. (J.A. 1217.) Despite her verbal commitment to Kansas, Jennings wished to play soccer at UNC at Chapel Hill because she “knew it was the number one school. It ha[d] all the national titles.” (J.A. 1216.)
The UNC women’s soccer team, which Anson Dorrance has coached since its inception in 1979, has long been the dominant program in the sport, winning 19 of 26 national titles, including the national title in 2006. Because of the program’s dominance, Jennings called Dorrance and expressed her interest. (J.A. 1216.)
Dorrance was familiar with Jennings because of a UNC soccer camp that she had attended, and he asked her if she had already committed elsewhere. After finding out about her Kansas commitment, he told her to speak with Kansas’ head coach to see if Jennings could visit Chapel Hill. (J.A. 1217-18, 1221.) Jennings did visit UNC and ultimately joined its soccer team as a walk-on recruit. Dorrance did not recommend her for a scholarship. (J.A. 181.)
During Jennings’ freshman season, in the fall of 1996, she was the third- or fourth-string goalkeeper and played in one preseason game and one regular season game. (J.A. 1334.) The team held practice every weekday afternoon during the fall and on Saturday mornings, except on game days. (J.A. 1042-43.) During the first 10-15 minutes of practice, before the formal drills began, the players had what they called “team time,” during which they would warm up, run a lap, and stretch as a group. (J.A. 1046-47.) Debbie Keller, the team captain in 1996, described these warm-ups as a time “at the beginning of practice to talk about our day and then get serious for practice,” to “talk about ... anything that would interfere with your concentrating on practice.” (J.A. 1044-45.)
The environment during team time was casual and informal, and the women joked and conversed about a range of topics, invariably talking about their social activities and their personal lives, including their sex lives. They talked about the “parties they had been to,” whom they were dating, and “who they hooked up with.” (J.A. 1047-51.) Some girls discussed “intimate sexual details,” (J.A. 1052), giving “in full detail, start to finish,” an account of “the night they spent with some guy,” including the “different sexual *710 acts they performed.” (J.A. 1054.) According to Keller, these players openly shared “too much info.” (J.A. 1055.) Others discussed the numerous sexual exploits they had undertaken within a short period of time. (J.A. 1055, 1058.) While most of the sex talk among the women during team time was more general than descriptive, like whether they “had sex” or whom they had “hooked up with,” (J.A. 1041, 1056), Keller testified that “anywhere between five to ten times” per season, the women gave “graphic,” “full detail,” “start to finish” descriptions of their sexual experiences. (J.A. 1054-55.)
Not all of the women discussed their sex lives so openly and in such detail during team time. Keller described degrees of openness among the players, with some women being “very wide open about” their personal and sex lives, others being intermediately so, and still others keeping their personal lives completely private. (J.A. 1053-56.) Jennings fell into the last group, testifying in deposition that she did not participate in her teammates’ sex-theméd conversations. (J.A. 1242, 1244.)
Once or twice a week, Coach Dorrance mingled with his players during team time, walking among them as they stretched and warmed up. (J.A. 1061.) The players’ team-time conversations were free-flowing, and Dorrance did not regulate their content. To the contrary, Dorrance regularly stopped and participated in these informal conversations, “joking around with different girls about their evenings before or just who they’re dating.” (J.A. 1057.) At times, Dorrance asked whether the players had been out drinking, and if so, how much. (J.A. 1067.) He also asked about team members’ families. (J.A. 1067.)
Because some of the women openly discussed their sex lives, Dorrance overheard some of their more frank discussions as he walked among them. According to Keller, “occasionally” and certainly not “every time that he walked through,” Dorrance would pause and engage in these discussions, commenting on his players’ “personal dating [and] sex lives.” (J.A. 1066.) Keller testified that Dorrance did not confine his. comments and inquiries to team time, but talked to his players at other times when “the team was together,” whether “after a game” or when waiting “for rides.” (J.A. 1128.) Amy Steelman, who played with Jennings during the 1996 season, remembers the frequency of Dor-rance’s interventions differently, averring that “[w]hen Anson Dorrance was around, he would encourage and participate in sexual discussions, sexual jokes, sexual talk, sexual banter, and sexual innuendos. A typical Monday afternoon included queries and discussions with Dorrance into the team members’ sexual and social exploits, particularly prying into our sex lives.” (J.A. 1452.) Jennings commented that “Dorrance’s sexual comments and inquiries took place on a regular basis.”[2] (J.A. 1585.)
Jennings testified that she never participated in any of the sexual banter engaged in mutually by her teammates and Dor-rance. (J.A. 1242-43.) Jennings also testified that Dorrance never directed any of his “team-time” comments at her. (J.A. 1242-43.) Although she did not partici *711 pate and although she was not targeted, Jennings paid attention to the banter, and she labeled much of what she overheard as inappropriate and humiliating. She testified to only two specific incidents about which she heard, however, to provide content to her general descriptions. First, one player informed the team, in Dor-rance’s presence, that over the course of an evening, she had sex with a man, crawled out of his window, crawled into another man’s window, and had sex with him too. (J.A. 1055, 1058.) Dorrance asked the player whether she knew the names of these men, and whether “she took tickets.” (J.A. 1236.) Dorrance also asked this player, who was very open about her promiscuity, who her “f**k of the minute,” “f**k of the hour,” and “f**k of the week” was, and how “many guys on the [lacrosse] team did she f**k?”[3] (J.A. 1237-38.) Second, another player spoke of a previous weekend with her boyfriend, and Dorrance asked her if she was “going to have a shag fest ... when he comes to town,” and whether she was “going to f**k him and leave him?” (J.A. 1284.)
Beyond these two incidents, Jennings testified about one other particular comment that Dorrance made at practice, although it was neither directed at her nor made in the presence of any player. During a water break, Dorrance was talking to a male athletic trainer, and Jennings overheard them both use the phrase, “Asian threesome.” (J.A. 1285.) Jennings heard Dorrance “kind of chuckle” and say, “Oh, yeah,” after hearing the phrase. (J.A. 1285.) Jennings interpreted the phrase to be a description of a fantasy involving two of her Asian teammates and one of the men. (J.A. 1284-86.) Jennings also complained of Dorrance’s use of profanity, including the words and phrases “f**k,” “unf**kingbelievable,” “what the f**k,” “f**king brilliant,” and “f**king stupid.” (J.A. 1231-33,1264-65.) Jennings testified that Dorrance would use such phrases when his players made mistakes, such as when he believed a player made a poor pass. (J.A. 1231.)
Jennings testified that Dorrance would occasionally comment on players’ physical attributes, complimenting one player for having “nice legs,” (J.A. 1233), and another for having “cute dimples,” (J.A. 1229), commenting on “asses in spandex,” (J.A. 1229), scorning one as a “fat ass,” (J.A. 1228), and referring to one woman’s chest as her “rack.” (J.A. 1236.) Jennings testified, however, that Dorrance never commented on any of her physical attributes, respectfully or disrespectfully. (J.A. 1243.) Jennings also admitted that Dor-rance never threatened her, never touched her, never ogled her, never propositioned her, and never made any form of sexual advance.
In fact, from her two years on the team, Jennings could testify of only two instances when her personal life was mentioned at all during soccer practice while Dorrance was present. The first occurred before practice when Jennings and some teammates were sitting on bleachers lining the soccer practice field with Dorrance nearby. (J.A. 1252-54.) One of the players spoke about her weekend with her boyfriend, and Dorrance asked if it had been a “shag fest.” (J.A. 1249.) The teammate, seeking to involve Jennings in the conversation and knowing that Jennings, whose nickname was “Trim’n” (which, Jennings stated, had no sexual connotation), had visited her boyfriend at a different school the previous weekend, asked, “What about Trim’n?” (J.A. 1246-48, 1252.) Dorrance “chimed in,” saying, “yes, what about Trim’n?” (J.A. 1246, 1252.) Jennings ig *712 nored the questions asked by her teammate and Dorrance, and left for the practice field to do “goal-keeper stuff.” (J.A. 1255.) The second instance occurred during team time when a teammate asked Jennings whether a boy she had seen Jennings hug after the previous day’s game was a boyfriend or just a friend. (J.A. 1257-59.) Jennings responded that the boy was just a friend. (J.A. 1258.) As for Dorrance’s involvement in the exchange, he was present, but Jennings could not remember whether he said anything. (J.A. 1258.)
As the season progressed, Jennings became concerned about the sexual banter and other issues, and she approached Susan Ehringhaus, then Assistant to the Chancellor and Senior University Counsel, sometime between September and November 1996 to express her concerns. (J.A. 1337-39, 1341.) Jennings trusted Ehringhaus because she was a woman; she was UNC’s top legal officer; and Jennings generally felt comfortable with her. (J.A. 1338.) Jennings told Ehringhaus (1) that Dorrance contributed to a “humiliating” and “uncomfortable” environment, giving Ehringhaus “a rundown of what I thought would encompass everything” regarding Dorrance’s inappropriate comments, including the specifics of Dorrance asking a team member “who the f**k of the week is.” (J.A. 1342-43); (2) that Dorrance failed to visit her in the hospital when she had become sick earlier that semester (J.A. 1335) and failed to mention to the team that her hospital stay was the reason she had missed a game (J.A. 1340); (3) that Dorrance requested that Jennings buy $400 worth of Gatorade for the team and the team’s opponent during the water supply disruptions caused by Hurricane Fran and subsequently failed to reimburse her (J.A. 197, 1344-15); and (4) that Dorrance encouraged Jennings to attend parties with her teammates, even though Jennings had told Dorrance that she was underage and alcohol was present at the parties (J.A. 198, 1338 — 10, 1347 — 18). Jennings did not relate that any of Dor-rance’s sexual comments had been directed at her. (J.A. 1346 — 17.) Ehringhaus stated that Jennings made no complaints about the sexual banter at this meeting or any other meeting until after Jennings had been cut from the team. (J.A. 198.) But according to Jennings, Ehringhaus responded to Jennings’ complaints by encouraging her to “work it out with” Dor-rance and asking whether she was “taking those comments into context.” (J.A. 1342.) Ehringhaus characterized Dor-rance as “a great guy” and related that she had “known him for a long time.” (J.A. 1342.) To Jennings, Ehringhaus “didn’t seem that concerned.” (J.A. 1342.)
A short time later, again during the fall of 1996, Jennings approached Ehringhaus for a second time. At this meeting, Jennings focused solely on Dorrance’s failure to reimburse her $400 for buying the Gatorade. (J.A. 1346.) Jennings did not mention anything about the sexual banter at practice. (J.A. 1345-46.) Following this meeting, Jennings’ father, Craig Jennings, also wrote a letter to the University, complaining of Dorrance’s failure to reimburse his daughter the $400. (J.A. 1352-53, 1411, 1543.) His letter did not mention any sexual comments at practice. (J.A. 1543,1551.) The reimbursement issue was thereafter resolved, and Jennings had no further meetings with Ehringhaus until after she had been cut from the team. (J.A. 1350-51.)
Dorrance had a custom of meeting with each of his players individually at the end of the soccer season for a personal assessment of their performance during the season in the areas of conditioning, skills, and on-field performance; contributions to team chemistry; and academic status. (J.A. 182-83.) For the 1996 season, Dor- *713 ranee held these end-of-year meetings in his hotel room while the team was in California during December to play in the national championship tournament. (J.A. 1305.) After the player before Jennings had finished her personal progress meeting with Dorrance, Jennings went in, and both she and Dorrance sat down at a table located by the window in his hotel room. (J.A. 1308.)
Dorrance began the conversation with “small talk,” asking Jennings such questions as “[H]ow are you doing?” and “[W]hat is going on?” (J.A. 1309.) Dor-rance began the substantive portion of the meeting by addressing Jennings’ grade point average, which was a 1.538 on a 4.0 scale. (J.A. 1449.) Jennings knew that she was in danger of losing her athletic eligibility due to her poor grades. Dor-rance told her that her grades “needed to improve” and that they were “not acceptable.” (J.A. 1315, 1316.) He explained how important her grades were, telling her she “ha[d] to study” and “do better in school.” (J.A. 1316.)
Seeking to find the reasons for Jennings’ poor academic performance, Dorrance asked Jennings if she needed help, inquiring whether she had been visiting the team’s academic tutor (which she had been). (J.A. 1318.) According to Jennings, Dorrance then inquired whether Jennings’ social life was affecting her grades, asking, “What is going on in [your] social life? Is that affecting [your] grades, is that affecting [you] as a player?” (J.A. 1329-30.) “Who are you f**king?” “Is that affecting your grades?” “[Is that] causing a pi’oblem with your grades, with your performance?” (J.A. 1326, 1330.) Jennings was taken aback by the question, and immediately replied that her personal social life was “[n]one of his god damn business.” (J.A. 1325, 1331.) Dorrance ceased his inquiry into the possible causes of Jennings’ poor academic performance and “started talking about [Jennings’] performance as a player.” (J.A. 1327.)
Because Jennings had played in only one game during the year, as well as one preseason game, (J.A. 1334), Dorrance focused his comments on Jennings’ conditioning, telling her that her statistics for weightlifting, sprinting, and the liké were below team standards and therefore needed to improve. (J.A. 1327.) Dorrance ended the meeting by telling Jennings to “[i]mprove [her] grades, first and foremost, and then ... improve [her] performance, ... [and to] fight for that first string, second string position.” (J.A. 1333.)
Jennings returned to the soccer team as a sophomore for the fall 1997 season, during which she again had minimal playing time, appearing in one or two games. (J.A. 1356.) Again at the end of the 1997 season in December, Dorrance met individually with each player for a personal progress assessment. At Jennings’ meeting, Dorrance discussed her academics, fitness, and contributions to team chemistry. (J.A. 1361.) He commented that Jennings’ cumulative GPA had improved to a 1.964 from the previous year’s 1.538. (J.A. 1449.) In Jennings’ words, Dorrance tried “to push me to continue in a positive manner with my grades. He was acknowledging the fact that I had made the effort.” (J.A. 1362.) But he told Jennings that she was still falling short of the team’s academic standards. (J.A. 1361.) He also told Jennings that she needed to focus on her fítness and training, commenting that she was not meeting the team’s standards in those areas either. (J.A. 1362.) Finally, he encouraged Jennings “to be a positive life source” for the team by cheering for the players from the sidelines, being “a comforting figure, and [a] positive person, being supportive of teammates, and everything else.” (J.A. 1362, 1363.) Dorrance *714 told Jennings that he would have to remove her from the team if she did not improve in each area. (J.A. 1363.) Nothing else was discussed. (J.A. 1365.)
During spring 1998 (the off-season), Jennings made efforts to be more involved in the team’s social activities, including hosting recruits, working at the team’s concession stand, and even hazing the team’s new members. (J.A. 1365-1372.)
On May 5, 1998, after Dorrance had asked each player to complete a self-evaluation and an evaluation of her teammates (J.A. 1391), Dorrance again conducted one-on-one meetings with his players. At Jennings’ meeting, Dorrance told her that her training and fitness levels were still below the team’s minimum standards (J.A. 1387), that her performance was subpar (J.A. 1395), and that she therefore “was no longer to be a part of the team.” (J.A. 1387.) Jennings was shocked and became “hysterically upset.” (J.A. 1392.) Jennings “was not expecting to get cut. I was expecting him to say, TCou know, you’ve improved.’ ... I thought I had done well. I even did my [skills] testing injured. [I] was, you know, making every possible attempt to do what he had asked.” (J.A. 1388.) Dorrance described Jennings’ efforts differently, observing that she “has no discipline to improve herself as a player, is a poor student and is bad for chemistry.” (J.A. 279.) “Jennings was clearly the worst goalkeeper on the team during the years she played.” (J.A. 182.)
A week after Jennings had been cut from the team, her father, Craig Jennings, wrote a letter to Ehringhaus, dated May 12, 1998. (J.A. 1551.) Although Craig Jennings had once before — in the fall of 1996 — written to Ehringhaus to complain about the delayed reimbursement for Jennings’ purchase of Gatorade and the presence of alcohol at parties attended by team players, he now complained for the first time about the personal and sexual nature of Dorrance’s comments and questions during practice and during the player interviews. Craig Jennings specifically complained:
Coach Dorrance has in every player/coach review (except the one last week) and at the practice field asked the following questions:
1. Who is your boy friend? Are you seeing anyone? What does he do? Are you enjoying the UNC campus? We personally do not find these questions totally offensive, but the answers are Melissa’s to give, if she chooses without retribution.
2. When answering yes to a boy friend or after bringing friends to team activities he then has asked the following: Are you sleeping with him? Are you shacking up with him? We find both of these questions totally inappropriate and harassing!
3. The Monday practice session team question has been on numerous occasions: Who is shacking up with whom? He will even question roommates on the field about the exploits of their teammates?
4. To one team member (not Melissa), he asks the team who her S_for the week is/was? Like most of the team members she can not respond because he totally owns her way through your fine institution and controls her ability to go to your school. This is the sickest form of harassment.
(J.A. 1551.)
Ehringhaus forwarded Craig Jennings’ May 12 letter to UNC Athletic Director Richard Baddour, who then ordered Beth Miller, the Senior Associate Athletic Director, to begin an investigation pursuant to UNC’s sexual harassment policy. (J.A. 200, 264.) Miller arranged a meeting on May 26, 1998, at which Jennings, Craig Jennings, Ehringhaus, Baddour, Dorrance, *715 and Miller herself attended. (J.A. 1529.) At the meeting, Jennings discussed the manner in which Dorrance had dismissed her from the team (J.A. 1401), recounted when Dorrance asked her about her sex life in their one-on-one evaluation meeting in December 1996 (J.A. 1404), and described the content of the sexual banter between Dorrance and his players. (J.A. 1406.) Dorrance responded with a firm denial of ever discussing sexual activity in a one-on-one meeting with any player, but he acknowledged that he participated in group discussions during practice that touched on his players’ sex lives. He maintained that his comments were only “of a jesting or teasing nature.” (J.A. 1531.)
Following the meeting, Athletic Director Baddour wrote Craig Jennings a letter dated June 9, 1998, in which he stated:
Any unwelcome discussions, including jesting, regarding sexual activity and team members’ relationships with men are inappropriate in the context you described. While Coach Dorrance strongly denies that he has ever discussed an individual team member’s sexual activity in a one-on-one discussion, Coach Dor-rance has acknowledged that he participated in group discussions of a jesting or teasing nature with soccer team members. This is altogether inappropriate. While his actions were not intended to be offensive, he now realizes that his involvement in such discussions is inappropriate, and he will immediately discontinue that activity. Appropriate interventions have also occurred with Coach Dorrance to address these unacceptable conversations.
The University and Coach Dorrance apologize for the “money issue.” He has maintained that he did not intend to embarrass Melissa in any way. He recognizes that he offended her and used poor judgment and for that he apologizes.
Coach Dorrance also realizes that his dismissal of Melissa was ill-timed, and he apologizes for the untimely discussion during the exam period.
(J.A. 1531.) Dorrance also signed the letter. (J.A. 1531.)
Athletic Director Baddour completed his investigation of Jennings’ complaints by reprimanding Dorrance in a letter dated June 10,1998, which stated:
As I indicated to you in our last meeting I am writing to officially notify you that it is inappropriate for you to have conversations with members of your team (individually or in any size group) regarding their sexual activity. Please refer to my letter of June 9, 1998 to Craig Jennings.
(J.A. 1533.)
B
On August 25, 1998, at the beginning of Jennings’ third year at UNC and a few months after she was. cut from the team, Jennings sued UNC and several individual defendants, including Dorrance, alleging (1) a Title IX claim, against UNC, (2) claims under 42 U.S.C. § 1983 against Dorrance for sexual harassment and invasion of privacy and against various UNC officials for failure to supervise Dorrance, and (3) a common law claim against Dor-rance for invasion of privacy. The district court granted the defendants’ motions for summary judgment, and a divided panel of this court affirmed. Jennings v. Univ. of N.C., 444 F.3d 255 (4th Cir.2006). A majority of this court’s active members voted to grant Jennings’ motion to rehear this case en banc.
II
Relying indiscriminately on the cata-logue of statements made by Coach Dor-rance and various members of UNC’s soc *716 cer team, made both before and after Jennings attended UNC, the majority concludes that they created a severe and pervasive sexually hostile environment that denied Jennings access to the opportunities and benefits of the soccer program. The majority’s approach lacks any precision about the meaning of comments, their connection with Jennings, their timing (some occurred before Jennings came to UNC), and their effect on Jennings and the soccer program. A disciplined analysis of the facts and their effect on Jennings can lead only to the conclusion that the sexual banter, while extensive and inappropriate, did not deny Jennings any educational opportunity. Indeed, she has never claimed that it did. The majority’s analysis amounts in essence to an evaluation of the vulgar language by Coach Dor-rance and teammates rather than an analysis of whether such violations of civility amount to a cause of action under Title IX.
While I agree that the sexual banter during soccer practices was vulgar and inappropriate, both as to Coach Dorrance- and the soccer team members, the banter had no effect on whether Jennings played soccer, or indeed whether she wanted to play soccer, at UNC. To the contrary, despite the banter, Jennings deeply desired to'be a member of the team. When she was cut for reasons unrelated to sexual banter, she was shocked and profoundly disappointed.
At bottom, Jennings made genuine complaints about vulgar sexual banter, but there were no complaints that the sexual banter denied her educational benefits. Therefore Jennings did not make out a Title IX claim.
Before conducting the analysis demanded by Title IX, a review of the statute’s requirements is necessary. This is particularly so because the majority has misdes-cribed the requirements of a Title IX claim, omitting the core requirement that the plaintiff demonstrate that she was denied the benefits of an educational program or activity on the basis of sex. See ante at 695.
Title IX prohibits an educational institution that receives federal funds from engaging in sex-based discrimination. The statute provides, with certain exceptions not at issue here, that “[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.” 20 U.S.C. § 1681(a). While Title IX does not, by its terms, create a private cause of action against the funding recipient, the Supreme Court has implied one, see Cannon v. Univ. of Chicago, 441 U.S. 677, 717, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), and it has held that money damages are available in such suits, Franklin v. Gwinnett County Pub. Schools, 503 U.S. 60, 76, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). The damages remedy will lie against the funding recipient, however, only when “an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [funding] recipient’s behalf has actual knowledge of discrimination in the recipient’s programs” and responds with “deliberate indifference to the discrimination.” Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998).
As with Title VII, “sexual harassment” under Title IX is a form of “discrimination.” See Franklin, 503 U.S. at 74-75, 112 S.Ct. 1028. In the context of student-on-student harassment, the Court has held that the harassment must be “so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits *717 provided by the school.” Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 650, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). But other than for student-on-student harassment, the Court has not defined the substantive contours of the harassment forbidden by Title IX. Nonetheless, courts of appeals have looked to the Supreme Court’s Title VII jurisprudence when interpreting Title IX. See, e.g., Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 65-66 (1st Cir.2002); Lam v. Curators of the Univ. of Mo., 122 F.3d 654, 656-57 (8th Cir.1997).
Because the Supreme Court implied in Davis that the “severe, pervasive, and objectively offensive” standard for student-on-student harassment was more demanding than Title VII’s “severe or pervasive” standard for harassment generally, I agree with the majority that the level of harassment required for actionable claims under Title IX in the case of teacher-on-student harassment is Title VII’s “severe or pervasive” standard. See Harris v. Forklift Sys. Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). This standard, of course, must be applied with sufficient discipline that the standard does not become a “general civility code.” Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).
Much more significant to Title IX liability, however, is the analysis required for determining when a given level of harassment brings about consequences with which Title IX is concerned. To succeed in a Title IX harassment claim, the plaintiff must prove that the harassment was so severe or-pervasive “that it can be said to deprive the [plaintiff] of access to the educational opportunities or benefits provided by the school.” Davis, 526 U.S. at 650, 119 S.Ct. 1661. This requirement of specified consequences derives from the text of Title IX itself, which shields students from “discrimination,” such as being “excluded from participation in” or “denied the benefits of’ any “education program or activity receiving Federal financial assistance” on the basis of sex. 20 U.S.C. § 1681(a). Therefore, harassment standing alone, no matter how severe or pervasive, is not actionable; it must have the effect of discriminating so that it effectively denies students of “equal access to an institution’s resources and opportunities.” Davis, 526 U.S. at 651, 119 S.Ct. 1661; see also 20 U.S.C. § 1681(a). Title IX’s purpose is not to eradicate harassment from the educational environment; it is “a specific federal statute designed primarily to prevent recipients of federal financial assistance from using the funds in a discriminatory manner.” Gebser, 524 U.S. at 292, 118 S.Ct. 1989.
Thus, Jennings must show that she was subjected to harassment — because of her sex — so objectively severe or pervasive that she was effectively denied equal access to UNO’s resources and opportunities.
Ill
In this case, Jennings’ evidence, while amply describing instances of sexual banter among teammates and Coach Dor-ranee, falls far short of demonstrating that Jennings was denied the benefits of soccer team membership. She has never alleged that she did not want to be a member of the team or that the banter denied her the benefits of membership. Indeed, she wanted to remain on the team and believed that her improvements in performance justified remaining on the team. She was shocked and angered when she was cut.
Moreover, Jennings complained only once to UNC officials during her two years on the team about the banter and then at such a low level that the person to whom *718 she complained did not recall it. In addition, when Jennings’ father wrote on Jennings’ behalf about problems that Jennings had encountered with the soccer program — a lack of reimbursement and invitations to parties at which alcohol was served — he did not mention any sexual banter or harassment. Only after Jennings was cut from the team were accusations of sexual harassment made.
Jennings has tried to argue that she was denied an educational benefit by asserting conclusorily and without factual support that Dorrance’s conduct “negatively impacted [her] academic performance and performance on the soccer field.” (J.A. 1585.) Yet, the record shows that when, over the course of two years, she was confronted with her poor academic and field performance, her response never suggested a problem with Dorrance’s conduct. Rather, the discussions focused on more disciplined training and more time for academics. Moreover, the record shows that Jennings did improve academically each semester. (J.A. 1449.) More revealing is Jennings’ own evaluation of herself that she was doing better. As she testified, when she was cut, she was expecting Dor-rance to say to her, “You know, you’ve improved.” (J.A. 1388.)
It is not surprising therefore that Jennings’ argument on appeal focuses entirely on whether Dorrance’s conduct was severe or pervasive, rather than on whether she was denied an educational benefit. The majority simply continues this emphasis by ignoring or misstating the core requirement of Title IX liability that conduct deprive a plaintiff of “equal access to an institution’s resources and opportunities.” Davis, 526 U.S. at 651, 119 S.Ct. 1661; see also 20 U.S.C. § 1681(a). The majority completely and inexplicably omits this core requirement from its boilerplate recitation of the necessary elements for “establishing] a Title IX claim on the basis of sexual harassment.” See ante at 695.
When the majority does purport to address the omitted requirement, it holds that Jennings may satisfy the requirement by merely alleging that Dorrance’s comments had a “negative impact” on her “performance on the soccer field.” See ante at 700. This holding stands on a complete misreading of Davis. If the majority sincerely believes that the Supreme Court “point[ed] out that sexual harassment reaches the level of actionable discrimination when it has ‘a concrete, negative effect on [the victim’s] ability’ to participate in a program or activity,” see ante at 699 (quoting Davis, 526 U.S. at 654, 119 S.Ct. 1661), it has blatantly ignored the entire portions of the opinion that actually define the cause of action. Contrary to the majority’s representation of Davis, the Supreme Court reiterated five separate times that Title IX’s discrimination requirement is satisfied “only where [the harassment is so severe or pervasive] that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.” See Davis, 526 U.S. at 654, 119 S.Ct. 1661 (emphasis added); id. at 633, 119 S.Ct. 1661 (same); id. at 651, 119 S.Ct. 1661 (same); id. at 652, 119 S.Ct. 1661 (same); id. at 653, 119 S.Ct. 1661 (same). It was only when the Court applied “this standard to the facts at issue” that it stated the following: “The harassment was not only verbal; it included numerous acts of objectively offensive touching, [including] criminal sexual misconduct.... Further, petitioner contends that the harassment had a concrete, negative effect on her daughter’s ability to receive an education.” Id. at 653-54, 119 S.Ct. 1661. It is almost too obvious to state, but the petitioner’s isolated contention in Davis did not define what it means to “discriminate” under Title IX, *719 as the majority apparently believes.[4] The Court accepted that allegation as part of a complaint that included allegations of “objectively offensive touching” of the plaintiff amounting to “criminal sexual misconduct.” The majority’s importation of and heavy reliance upon a watered-down “negative impact” test, derived from a single allegation in the Davis petitioner’s complaint, is obviously wrong, particularly when the Court specifically and repeatedly articulated the Title IX cause of action.
The majority’s gutting of the “denial of benefit” requirement is not only contrary to the Supreme Court’s pronouncements in Davis, but more importantly, it contravenes the actual text of the statute, which only shields students from “discrimination,” such as being “excluded from participation in” or “denied the benefits of’ any “education program or activity.” See 20 U.S.C. § 1681(a) (emphasis added).
The acts of sexual harassment alleged by Jennings can be divided, for discussion purposes, into three categories: (1) “sexual” banter at practice directed at or involving Jennings; (2) other sexual banter at practice among teammates and Coach Dor-rance; and (3) the December 1996 evaluation-meeting between Jennings and Dor-rance at which Dorrance inquired, as part of his effort to discover the cause of Jennings’ poor grades, who Jennings was “f**king.” I address these in turn.
A
Jennings identified two incidents during her two years on the team when the banter at practices involved or implicated her.
The first incident arose prior to a practice when one of Jennings’ teammates recounted her weekend’s activities with her boyfriend, and Dorrance asked if it had been a “shag fest.” (J.A. 1249.) The teammate, seeking to involve Jennings in the conversation and knowing that Jennings had visited her boyfriend at a different university the previous weekend, asked, “What about Trim’n?” (J.A. 1246-48, 1252.) Dorrance “chimed in,” saying, “yes, what about Trim’n?” (J.A. 1246, 1252.) Jennings ignored these questions from her teammate and Dorrance and left for the practice field. (J.A. 1255.)
Dorrance’s question was an offhand comment amounting to “simple teasing.” It was Jennings’ teammate who instigated the efforts to involve Jennings in the conversation, and Dorrance’s question was merely a follow-up to hers. The only reason the question even achieves the status of “simple teasing,” instead of being utterly innocuous, is because of Dor-rance’s earlier “shag fest” comment to Jennings’ teammate. A “recurring point” in the Supreme Court’s Title VII opinions, however, is that “ ‘simple teasing,’ offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the ‘terms and conditions of employment.’ ” Faragher, 524 U.S. at 788, 118 S.Ct. 2275 (citation omitted). The Court’s “standards for judging hostility are sufficiently demanding” to “filter out complaints attacking the ordinary tribulations” of collegiate athletics, “such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.” Id. (citation and quotation marks omitted). This incident certainly falls within the “simple-teasing” category.'
The second incident involved a teammate asking Jennings whether a boy she *720 had seen Jennings hug was a boyfriend or just a friend. (J.A. 1257-59.) Jennings responded that the boy was just a friend. (J.A. 1258.) As for Dorrance’s involvement, Jennings remembers him being present but saying nothing. (J.A. 1258.) Not even the majority relies on this incident, for reasons that are obvious — it could neither stand alone as an incident of sexual harassment nor add to a collection of incidents constituting sexual harassment.
B
The sexual banter at practices among teammates and Coach Dorrance also does not rise to sexual harassment of Jennings. Jennings rightfully places herself as a bystander during this banter. When there is an absence of sexual harassment directed at a plaintiff, however, environmental conduct voluntarily engaged in by others has never supported a claim for sexual harassment.
In the two cases where we have most relied on background conduct in applying the “severe or pervasive” standard, the direct harassment of the plaintiff still provided the foundation for the hostile environment claim. In Spriggs v. Diamond Auto Glass, 242 F.3d 179 (4th Cir.2001) (Spriggs II), we took into account environmental conduct as enhancing conduct specifically directed at the plaintiff. But the core of the harassment claim in Spriggs was based on a white supervisor repeatedly calling his African-American subordinate, “dumb monkey” and “nigger,” during the relevant employment period. . See Spriggs v. Diamond Auto Glass, 165 F.3d 1015, 1017 n. 2 (4th Cir.1999) (Spriggs I). Similarly, in Ocheltree v. Scollon Prod. Inc., 335 F.3d 325 (4th Cir.2003) (en baric), we took environmental conduct into account, but primarily to enhance the core sexual harassment directed at the plaintiff, who was a female. The targeted harassment included male coworkers confronting the plaintiff with a pornographic picture depicting pierced male genitalia; simulating oral sex on a mannequin while fondling the mannequin’s breasts in front of the plaintiff in order to rile and offend her; and singing to the plaintiff, in an operatic voice, “Come to me,' oh, baby come to me, your breath smells like come to me.” Id. at 328.
In cases where there was a scarcity of direct harassment, however, the plaintiffs could not rely on environmental conduct to make their claim. See, e.g., Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753-54 (4th Cir.1996) (upholding entry of summary judgment against complainant because of his overreliance on incidents “not directed specifically at him,” such as those occurring in “group settings”).
Moreover, the Supreme Court itself has assumed throughout its Title VII and Title IX cases that only harassment directed and targeted at the victim was capable of creating a hostile environment. In Meritor, for example, “sexual harassment” was defined as “unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.” 477 U.S. at 65, 106 S.Ct. 2399 (citation and quotation marks omitted) (emphasis added). In Harris, the Court stated that the workplace must be “permeated with discriminatory intimidation, ridicule, and insult.” 510 U.S. at 21, 114 S.Ct. 367 (citation and quotation marks omitted). But the intimidation, ridicule, and insults in Harris, as elsewhere, targeted the victim. 510 U.S. at 19, 114 S.Ct. 367 (stating the victim was made “the target of unwanted sexual innuendos”). Thus, in Davis, the student was not only verbally assaulted, but was also touched in a manner that amounted to “criminal sexual misconduct.” 526 U.S. at 653, 119 S.Ct. 1661. In Faragher, the complainant faced “uninvited and offensive touching” and such choices as, “[d]ate me or clean the toilets for a *721 year.” 524 U.S. at 780, 118 S.Ct. 2275. In Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 77, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), the complainant “was forcibly subjected to sex-related, humiliating actions against him,” such as being “physically assaulted ... in a sexual manner” and being “threatened with rape.” These examples fairly reflect the Court’s consistent teaching that Title VII and Title IX protect victims, not witnesses, of harassment.
In short, the indirect sexual banter of which Jennings complains cannot on its own support Jennings’ harassment claim. Nor does it heighten the discriminatory impact of the one instance of simple teasing directed at her so as to satisfy the demanding requirement that the harassment be so “severe or pervasive” that it “effectively bar[ ] the victim’s access to an educational opportunity or benefit.” Davis, 526 U.S. at 633, 119 S.Ct. 1661.
C
The third and perhaps principal incident of which Jennings complains occurred during Jennings’ end-of-year personal progress meeting in December 1996. It arose from Dorrance’s inquiry into the causes for Jennings’ poor academic performance during her first semester at UNC. Jennings’ GPA at the time was 1.538 on a 4.0 scale. (J.A. 1449.) During the meeting, Dorrance impressed upon her the importance of her studies, telling her that she “ha[d] to study” and “do better in school.” (J.A. 1316.) He then sought to find the causes of Jennings’ poor academic performance, as a responsible coach who risked losing a player due to academic ineligibility would do. Dorrance asked Jennings if she needed help, if she had been visiting the team’s academic tutor (which she had been). (J.A. 1318.) He then wondered whether Jennings’ social life was affecting her grades, asking, according to Jennings’ testimony, “What is going on in [your] social life? Is that affecting [your] grades?” (J.A. 1329-30.) “Who are you f**king?” “[I]s that affecting your grades?” “[Is that] causing a problem with your grades, with your performance?” (J.A. 1326, 1330.) Jennings forcefully replied that her personal social life was “[n]one of his god damn business.” (J.A. 1325-26, 1331.) Dorrance immediately dropped the subject, and according to Jennings, “started talking about my performance as a player.” (J.A. 1327.)
As phrased, Dorrance’s question “Who are you f**king” was plainly vulgar and certainly too personal. Nonetheless, the inquiry clearly did not focus on sex or include an overture to sex; it was, in context, obviously an inquiry about what was occupying Jennings’ time. Jennings bordered on the verge of becoming academically ineligible to play soccer, and Dorrance, as her coach, intervened, asking if her grades were being adversely affected by her social life. Dorrance’s question about Jennings’ sex life was not physically threatening; it was not a sexual proposition; it was not made in an attempt to humiliate, degrade, and demean. See Harris, 510 U.S. at 23, 114 S.Ct. 367 (differentiating between the “physically threatening or humiliating” comment and the “mere offensive utterance”). Rather, the question was asked in an effort to discover the cause of Jennings’ poor academic performance. Dorrance’s use of profanity and his inquiry into a personal subject for purposes of a legitimate inquiry about Jennings’ time does not transform the single, isolated question into a “severe” example of sexual harassment. The context and purpose of the question, indeed, removed it from any consideration as sexual harassment of the kind prohibited by Title IX. See Harris, 510 U.S. at 21, 114 S.Ct. 367 (“ ‘[M]ere utterance of an ... epithet which engenders offensive feelings in an employee’ does not sufficiently affect the *722 conditions of employment to implicate Title VII” (quoting Meritor, 477 U.S. at 67, 106 S.Ct. 2399)).
* * *
Jennings cites no other incidents to support her claim, and she testified at the end of her deposition that this was all that she knew. (J.A. 1430-31.) She only became aware of other evidence — evidence upon which the majority relies heavily — after the commencement of this action. We are thus left with one simple incident of teasing, the team’s sexual banter which Jennings overheard, and one coarsely posed question about what time-consuming distraction might be affecting Jennings’ grades.
To evaluate such evidence for liability, courts must determine whether an environment is sufficiently hostile or abusive “by looking at all the circumstances,” Harris, 510 U.S. at 23, 114 S.Ct. 367, including the context of the case, which in this case is the collegiate athletic field. See Oncale, 523 U.S. at 81, 118 S.Ct. 998 (explaining that a football player’s environment “is not severely or pervasively abusive ... if the coach smacks him on the buttocks as he heads onto the field — even if the same behavior would reasonably be experienced as abusive by the coach’s secretary (male or female) back at the office”). The collegiate athletic field is unlike the typical classroom, and the collegiate athletic coach is unlike the typical university instructor. The proper baseline by which to judge the language of Coach Dorrance and Jennings’ teammates is the world of competitive collegiate athletics in which coaches, by necessity, have a much more casual and personal relationship with their student-athletes. While vulgarity of the level witnessed by Jennings was surely not necessary to the program, it is undoubtedly normal for a coach to have discussions with a player about his or her body, athletic performance, academic performance, inter-player relationships, social activities, and extracurricular activities. College sports, especially an elite program like women’s soccer at UNC, involve long and intensive daily practice sessions, extensive overnight travel, and a significant amount of downtime spent together.
Some coaches use profanity or sarcasm as a way to express displeasure, to emphasize a point, or to motivate. Dorrance, according to Jennings, cursed when his players made mistakes, such as when a player made a poor pass. (J.A. 1231.) But Title IX does not protect students from profanity. See McWilliams v. Fairfax County Bd. of Supervisors, 72 F.3d 1191, 1196 (4th Cir.1996) (holding that Title VII does not protect employees from discrimination “ ‘because of [the harasser’s] vulgarity and insensitivity and meanness of spirit”).
The critical inquiry in this case, as in all Title IX cases, is whether the alleged harassment was so objectively “severe [or] pervasive ... that it can be said to deprive [Jennings] of access to the educational opportunities or benefits provided by the school.” Davis, 526 U.S. at 650, 119 S.Ct. 1661. The majority’s application of a simple “negative impact” test — whether Dorrance’s comments had a “negative impact” on Jennings’ “performance on the soccer field,” ante at 700 — is simply inconsistent with the governing statute and with Supreme Court precedent, both of which require that the harassment actually “discriminate” by “depriving] the [plaintiff] of access to ... educational opportunities or benefits.” See 20 U.S.C. § 1681(a); Davis, 526 U.S. at 650, 119 S.Ct. 1661.
On this record, it cannot be said that Dorrance’s language effectively excluded Jennings from participating as a member of UNC’s women’s soccer team, especially in light of Jennings’ own testimony. And her empty assertion, made conclusorily in *723 a litigation affidavit, that Dorrance’s conduct “negatively impacted” her performance is completely undermined by her own testimony of the events. When Dorrance cut her from the team, Jennings testified that she was shocked, and hysterically upset at being cut because she thought she had been improving as a player. She thought she had done well, doing everything she could to become a better player under Dorrance’s direction. In Jennings’ own words, “I was not expecting to get cut. I was expecting [Dorrance] to say, “You know, you’ve improved,’ this and this. I thought I had done well.... I was, you know, making every possible attempt to do what he had asked.” (J.A. 1388.) This testimony hardly depicts a player who has been sexually harassed to the point of being denied the educational opportunity of playing on the team. The majority’s effort to depict the environment on the soccer team as one that denied Jennings (or any other player, for that matter) the benefits of playing soccer is belied by this testimony.
Furthermore, Jennings’ grade point average progressively improved during her two seasons on the team. Her cumulative GPA at the end of her freshman year was 1.539, at the end of the 1997 summer sessions it was 1.903, at the end of the fall 1997 semester it was 1.964, and at the end of the 1998 spring semester, when she was cut from the team, it was 2.022. (J.A. 1449.) If a decline in grades is evidence of discriminatory impact, then an improvement in grades should be evidence otherwise. Cf. Davis, 526 U.S. at 652, 119 S.Ct. 1661 (stating that even “a mere decline in grades” is insufficient to prove that the alleged harassment has deprived a student of access to school resources). A player, who not only does not leave a team or school, but also has a willingness or indeed a growing desire to remain with the teaih or school, must surely have to make an extraordinary showing to sustain a Title IX claim.
The majority fails to confront the legal consequences that flow from the undisputed fact that Jennings’ evidence consists of (1) only two direct verbal comments made over the course of two years, and (2) second-hand comments that neither paint women in a negative or demeaning light, nor constitute anything approaching sexual advances, threats, coercion, or intimidation. In the face of her teammates’ graphic, detailed, and open descriptions of their sexual exploits, Jennings complains of Dorrance going too far in his teasing. But however this environmental language is characterized, it falls woefully short of elevating the two verbal comments directed at Jennings to a level at which one could conclude that Jennings was denied the benefits of playing soccer for UNC. As Jennings’ own testimony provides, it was her substandard conditioning, performance, and grades that did that.
IV
Jennings’ Title IX claim must fail for another, independent reason. Dorrance’s comments were not gender-based, in that they were not made because Jennings was a woman. Title IX prohibits discrimination “on the basis of sex.” 20 U.S.C. § 1681(a). A person “is harassed or otherwise discriminated against [‘on the basis of] his or her sex if, ‘but for’ the employee’s sex, he or she would not have been the victim of the discrimination.” Wrightson v. Pizza Hut, 99 F.3d 138, 142 (4th Cir.1996). “The critical issue” is “whether members of one sex are exposed to disadvantageous terms or conditions ... to which members of the other sex are not exposed.” Harris, 510 U.S. at 25, 114 S.Ct. 367 (Ginsburg, J., concurring).
The direct harassment of which Jennings complains was in no way related to *724 her gender. Dorrance asked, “What about Trim’n?”, not because Jennings is a .woman, but because he and a teammate wished to engage Jennings in a conversation about her dating life. Her gender was irrelevant to the question. Even more plainly, Dor-rance did not ask Jennings about her sex life in December 1996 because of her gender, but because he was trying to discover the cause of Jennings’ substandard academic performance. Jennings’ gender played no role in Dorrance’s question.
Furthermore, there is no evidence on the record from which to infer that “but for” Jennings’ gender, Dorrance would have refrained from teasing Jennings about her dating life and from asking whether her sex life was affecting her grades. An integral attribute of Dor-rance’s coaching style was his willingness to engage his players on a personal and frank level. If Dorrance was then the coach of the men’s soccer team, he would just as surely have teased his male players about their weekends with their girlfriends as he lightly teased Jennings about her weekend with her boyfriend. Such teasing about a player’s social life is the norm on any collegiate athletic team, whether male or female. Indeed, Jennings had the opportunity to present evidence that Dor-rance treated women differently than men, as Dorrance simultaneously coached both the men’s and women’s soccer teams at UNC from 1979 to 1988.- But the record remains silent about any such difference.
In addition, there is no evidence that Dorrance’s inquiry about Jennings’ social life was gender-based. Responsible coaches, whether of a men’s or women’s athletic team, search for the cause of a player’s borderline academic ineligibility, including whether the player’s social life is interfering. While Dorrance posed his question too crassly and personally, the question nonetheless was a grade-centered inquiry and not an inquiry made because Jennings was a woman. There is no evidence on the record that “but for” Jennings’ gender, Dorrance would not have teased about her weekend or asked whether her sex life was affecting her grades.
As for the second-hand sexual banter, its relevance becomes yet more remote when considering whether Jennings was exposed to the banter because of her gender. There is no evidence that distinguished her environment from a male environment, where players would undoubtedly hear the same banter. She was exposed because she was a member of the team, not because she was a woman. At the beginning of oral argument, Jennings’ counsel conceded that there would be no case if every fact were the same except that the team was full of male players “because [in that hypothetical] it would not be gender based.” This concession is fatal because it necessarily relied on a further concession — 'that the evidence, standing alone, could not show that Jennings was discriminated against because of her sex.
Moreover, it would be ridiculous to infer that Dorrance’s comments were motivated by general hostility toward the presence of women on a women’s soccer team, when he was the coach of the team. See Oncale, 523 U.S. at 80, 118 S.Ct. 998 (stating that when the harassing conduct is not motivated by sexual desire, an inference, of gender-motivated harassment may still be derived if a victim “is harassed in such sex-specific and derogatory terms ... as to make it clear that the harasser is motivated by general hostility to the presence of women [or men] in the [educational setting]”). Indeed, Dorrance has been the head- coach of the women’s team for 27 years (since 1979), leading his players to 19 national championship titles. This duration and success rate makes any inference that Dorrance is generally hostile to *725 young women soccer players even more preposterous.
“Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted ‘discrimination [on the basis of sex].’ ” Oncale, 523 U.S. at 81, 118 S.Ct. 998. The evidentiary route that Jennings has chosen, for the reasons given, does not prove discrimination “on the basis of sex.” See 20 U.S.C. § 1681(a).
V
Jennings seeks to hold Dorrance and Ehringhaus personally liable for sexual harassment under 42 U.S.C. § 1983, basing her claim on her Fourteenth Amendment equal protection right to • be free, from sexual harassment in educational settings. The Equal Protection Clause
confers a right to be free from gender discrimination that is not substantially related to important governmental objectives. Applying this precept, courts have held that intentional sexual harassment of employees by persons acting under color of state law violates the Fourteenth Amendment and is actionable under § 1983. Courts may apply the standards developed in Title VII litigation • to ■ similar litigation under § 1983.
Beardsley v. Webb, 30 F.3d 524, 529 (4th Cir.1994) (citations and quotation marks omitted).
Because Jennings has failed to demonstrate that Dorrance’s language was so severe or pervasive as to deny her the opportunity to play soccer for UNC, it follows that her § 1983 claim must also fail.
VI
Participation in intercollegiate athletics involves, of necessity, a level of physical and mental training that toughens a player in competition. It is not the same type of training that attends participation in a chamber orchestra or a, debate team. Driving players to reach beyond their physical limits often involves yelling, encouragement, and condemnation. We can hardly apply the standards of the classroom or the courtroom to the language of the athletic field.
Of course, the environment cannot provide a cover for discrimination, including sexual harassment. In disposing of a case as this, we must discern the difference without imposing a civility code.
In the context of this case, Title IX presents the narrow issue of whether a player — in this case Jennings — was denied the benefits of the soccer team because of Coach Dorrance’s comments. It is crystal clear that she did not think so until after she was cut from the team. From her anger and disappointment in being cut— concededly not because of sexual discrimination — she pursues this unfortunate lawsuit to complain about vulgar language that surely did offend her, and rightfully so. But Title IX requires more.
For these reasons, I would affirm the judgment of the district court.
Judge WILLIAMS has authorized me to indicate that she joins in this opinion.

. For instance, the majority repeatedly relies on Dorrance's “fly on the wall'' comment without mentioning that Dorrance allegedly made this comment to Debbie Keller, the team captain, in the spring of 1994 — more than two years before Jennings enrolled at UNC. (J.A. 1068.) The majority also relies on numerous instances about which Jennings never had any knowledge — nothing in the rec *709 ord imputes them to Jennings’ knowledge, and Jennings herself never referred to them, even though she testified to every incident of which she had any awareness. (J.A. 1430-31.) Thus, the majority relies on the fact that Dorrance told a player "to keep your knees together ... you can’t make it so easy for them” or asked another whether she was "going to have sex with the entire lacrosse team.” (J.A. 1127.) But Jennings never heard those comments. Jennings also never testified knowing that Dorrance asked a player about the size of her boyfriend’s genitalia. (J.A. 1452.) Similarly, the majority relies on the fact that Dorrance showed overt affection for Keller. But Jennings’ only testimony in this regard is in relation to the weight room incident, which she described as follows: ”[W]e are in the weight room, [Debbie Keller] goes off -and talks with [Dorrance] in the bleachers.” (J.A. 1290.) Finally, neither Jennings nor Keller ever testified that Dorrance “dangl[ed] his hand in front of [Keller’s] chest,” (J.A. 1452-53), as relied on by the majority.

. Dorrance has a much different recollection of the facts. In his affidavit, he stated: "I never initiated comments on those topics, only infrequently heard players' comments on those subjects and even less frequently said anything to any player at those times about those subjects.” (J.A. 186.) Several former soccer players who were Jennings' teammates at UNC submitted affidavits consistent with Dorrance's version of the facts. (J.A. 320, 324, 330, 332). At this summary judgment stage, of course, these allegations must be ignored, and the truth of the testimony of Jennings, Keller, and Steelman must be accepted.

. Keller testified that Dorrance “would use words more like 'promiscuous,' ” asking “how many people are you going to sleep with.” (J.A. 1127.)

. Indeed, the majority even waters down the petitioner’s allegation in Davis. In Davis, the petitioner contended that the harassment had a "concrete, negative effect on her daughter's ability to receive an education." Davis, 526 U.S. at 654, 119 S.Ct. 1661. The majority converts "receive an education” to "participate in a program or activity.” Ante at 699.